STATE OF FLORIDA, *ex rel.* J. B. JOHNSON, ATTORNEY GENERAL, *Relator*, v. CITY OF SARASOTA, A MUNICIPAL CORPORATION, *Respondent*.

## Division A.

## Opinion Filed August 6, 1926.

1. In locating boundaries. it is permissible to begin at any definite corner or monument, and to run a reverse course if necessary to harmonize all the calls in a description.

2. If a surveyor, by applying the recognized rules of surveying, can locate and identify the land as described in a deed, the description will be held sufficient, and, by analogy, the description of municipal boundaries contained in a legislative act will not be held void for uncertainty if by applying the same rule the description encloses an area of land which could thus be located.

3. Where the description of municipal boundaries in an act of the legislature (Chapter 11724, Acts of Special Session 1925,) contains superfluous words, which describe a dead-end line running out at right angles from the boundary, enclosing nothing. and the description is otherwise definite and complete, describing a definite area which is completely enclosed by an unbroken boundary line, such superfluous words describing such dead-end line will be treated as harmless surplusage and their presence in the act will not be permitted to defeat the legislative intent or affect its validity.

4. The recognized rule in this jurisdiction is that where the description of territory incorporated within municipal limits by a special law does not utterly fail to enclose or cover some area, and the description is not so uncertain as to make it impossible to determine the territory intended to be included in the municipality. the law is not void for uncertainty of description.

5. The right to be a municipal corporation or to exercise a municipal franchise cannot be challenged by the individual citizen in his own name or right. Such franchise can be granted or withheld by the State at its pleasure, and proceedings to arrest the usurpation of such a franchise must run in the name of the State on the relation of the Attorney-General, by the filing of an information in the nature of a *quo warranto*, and the institution of such proceeding is within the discretion of the Attorney-General.

6. The general common law rule is that a private individual, without the intervention of the Attorney-General, cannot file an information in the nature of a *quo warranto* to test the existence of a public franchise, but under the Statute of Anne, 9 Chapter 20, such informations were permitted to be filed upon the relation of any person interested in the subject matter of the proceeding. A distinction is made between usurpations which affect public rights alone, and those which primarily affect private rights, though they at the same time involve the usurpation of a public franchise.

7. *Quo Warranto* is a civil rather than a criminal remedy, and the pleadings are governed generally by the rules applicable to ordinary civil proceedings.

8. The rule is well settled that the constitutionality of an act cannot be questioned by a party whose rights are not affected by its enforcement. One who is not himself denied some constitutional right or privilege cannot be heard to raise constitutional questions on behalf of some other person who may at some future time be affected.

9. In order to protect their personal constitutional rights, if any, individuals affected by the usurpation of a public franchise must secure the institution of *quo warranto* proceedings in appropriate form, in the name of the State, or the proper amendment of proceedings already pending, where such is permissible in *quo warranta* proceedings, so as to bring their rights before the court for adjudication.

10. Where, as here, the information runs in the name of the State by its representative, the Attorney General, no individuals being joined as co-relators, and charges in general terms the usurpation by a municipality of corporate rights and privileges without authority of law over certain described territory, the presumption is that the State by its Attorney General is acting for the State in vindication of public rather than private rights, nothing to the contrary appearing, and where the respondent city sets up by its answer as justification a legislative enactment extending its limits so as to include such territory, valid on its face, such answer will be held to be sufficient, although it also appears therefrom that such territory contains a considerable body of unimproved and uninhabited rural lands, it not being shown that the owners of such lands are objecting to their inclusion within the city limits or are asserting in any way their personal constitutional rights or privileges, if any, as against the validity of such act.

11. The mere inclusion within municipal boundaries by legislative enactment of a considerable body of rural lands, does not *per se render* such act unconstitutional and void, in the absence of any proper showing that the constitutional rights of the owners of such lands are invaded thereby.

12. The legislature is vested by the constitution with the power to prescribe the territorial boundaries of municipalities, and the exercise of such power will not be disturbed so long as it is done in harmony with other applicable provisions of the State and Federal Constitutions, and not in violation of properly asserted individual constitutional rights. The supremacy of the legislature over municipal corporations and their boundaries is not in all respects unlimited, but the limitations must be found in either the National or State Constitutions, and not in any mere opinion the courts might entertain as to the wisdom or policy of such legislation in any particular case.

A case of original jurisdiction.

Demurrer to answer overruled.

*Mabry, Reaves & Carlton,* for Petitioner;

*Sawyer, Surrency, Carter & Keen, Burket & Fish* and *King* and *Barringer,* for Respondent.

### STATEMENT.

This is an original proceeding by *quo warranto,* the writ having been granted by this court upon a petition or information filed by the Attorney General, to test the validity of Chapter 11724, being "an act to enlarge the territorial limits and jurisdiction of the City of Sarasota," etc., approved November 30, 1925, and appearing on pages 1978-82 of the Acts of the extra session of the Legislature held in November, 1925. The respondent filed an answer to the writ, and to this answer the relator interposed demurrer.

The writ calls upon the respondent to forthwith answer to the State of Florida by what warrant or authority it claims to have and exercise corporate powers and privileges over the territory described in the writ, being the territory set forth in said act, except that part of such territory which constituted the corporate limits of said city prior to said Act of November 30, 1925.

The city answered that it was exercising such corporate powers over the territory described in the writ by virtue of the legislative act above referred to, which described the territorial limits of the City of Sarasota, as extended and enlarged by said act, as follows: "All that portion of Sarasota County bounded on the north by the Manatee County line, on the east by a line running north and south on Range line, beginning at the northeast corner of Section One (1) of Township 36 South, Range 18 East, running thence south on Range Line between ranges 18 and 19 to

Township 37, thence on the township line to the northeast corner of Township 37, thence south on the range line to the southeast corner of Section 25 in said Township 37 South, Range 18 East, thence west on section lines and the extension thereof across Little Sarasota Bay and the Off-Shore Islands or Keys to the Gulf of Mexico, thence north-westerly along the Gulf shore of said Islands or Keys at extreme low tide including the continuation of such lines from Key to Key on the Gulf side, to a point intersecting the Manatee County line, or extension thereof, thence east on said County line to the point of beginning except SW¼ of SW¼ of Section 27, and S½ of SE¼ of Section 28 in Township 37 South, Range 18 East.''

The answer also embraces the following allegations:

''Further answering respondent would respectfully set forth and show certain additional facts for the information of the Court, relative to the character and occupation or non-occupation of the territory described in the writ, as follows:

''That the population of the Old City in 1925 was 5,500; the population of Greater Sarasota added to that of the Old City is, in 1926, approximately 15,000;

''That the assessment rolls of taxable property of the Old City for the year 1925 shows a total valuation for taxation of $56,650,000.00, with a tax rate for city purposes of 6½ mills;

''That the present bond indebtedness of the Old City is $1,433,000.00, including bonds issued for water works and extensions which the City still owns;

''That the water mains for the distribution of water for domestic and public consumption, are at this time supplying 95% of the population in the Old City limits, and are accessible to and capable of supplying water to the entire population of the Old City;

''That the sewer mains owned by the City now supply

68% of the population in the Old City, and are accessible to and capable of serving 80% of the population.

"That privately owned water systems, which are to be taken over by the City and owned and operated by it, are already laid and in operation in the following subdivisions, as shown on the plat of Sarasota filed herewith, marked 'Exhibit B' and made and prayed to be taken as a part of this answer:

Sapphire Shores, Indian Beach Estates, and Broadway Court, in Section 1, Township 36, Range 17;

Bay Haven, in Section 12, same township and range;

Palm Grove, in Section 7, Township 36, Range 18;

"Fairway," in Section 17, same township and range;

Edgewater, Hillcrest, Sevilla and Valencia Terrace, in Section 18, same township and range;

Avion, Villa Serena, and Morningside, in Section 21, same township and range;

East Addition to Sarasota;

McClellan Park, DeSoto Park, LaLinda Terrace, Poms Park, Cherokee Park, and Granada, in Section 29, same township and range;

Avondale, in Section 30, same township and range.

"Electricity is being supplied to the north of Old City, adjacent to Tamiami Trail and Bradenton Road. Also south along Tamiami Trail over a privately owned line. The supply does not reach at present any point within the three mile strip ·(hereinafter defined), except Fair Grounds and Bee Ridge. The electric plant is owned and operated by the Florida Light and Power Company, a large private corporation, it having purchased the plant from the City in February, 1926.

"In the three mile strip, (meaning the area bounded on the east by the range line between Ranges 18 and 19, and extending west three miles the full length of Greater Sarasota North and South), there are 230 houses, 85 one-

room houses and 46 tents, several of which are vacant.

"In Township 36 South, Range 18, the following are the number of houses according to sections:

"In Section 1 there are two houses; in Section 2, there are two houses; in Section 10, there are seven houses; in Section 15 there are two houses. The County Fair Grounds are located in this section, and there are a few camp houses in addition to the regular Fair Grounds buildings; in Section 22 there are 27 one-room houses, 43 tents and two houses; in Section 23 there are 70 houses; in Section 25 there are 59 houses, which includes three tents; in Section 34 there are five houses.

"In Township 37 South, Range 18 East, the following is the number of houses by sections:

"In Section 1 there are two houses; in Section 2 there are 22 houses; in Section 3 there are 58 one-room houses, eleven two-room houses and one three-room house. This is a road construction camp. In Section 10 there are 23 houses; in Section 11 there are two houses; in Section 13 there are 15 houses; in Section 14 there is one house.

"There are no houses at this time in the following sections of the said three-mile strip: Sections 3, 11, 12, 14, 24, 26, 27, 35 and 36 of Township 36, Range 18; and Sections 12, 15, and 22 to 27 inclusive, of Township 37, Range 18. The lands in those sections are unimproved and uncultivated, being ordinary flat pine lands, with some small lakes or ponds, and some marshes and lowlands.

"Said three-mile strip is under the drainage system of Sarasota-Fruitville Drainage District, except Sections 1, 2 and 3, Township 37 South, Range 18 East, and all the sections to the south of these lying within the three-mile strip. That the canal system is designed to drain all ponds, swampy places and lowlands in the territory of the drainage district, and is almost complete.

"Further answering respondent would respectfully show that pursuant to the said act of the Legislature of November 30, 1925, enlarging its territorial limits, and before the institution of any suit or legal proceedings in any court to question the validity of respondent's authority and jurisdiction over the territory described in the writ, respondent had entered into contracts for public improvements, including streets, parks, and highways for municipal purposes in a large sum, a statement of which contracts and improvements is hereto attached, marked Exhibit 'C', and made and prayed to be taken as a part of this answer; that among the contracts so let or entered into for public improvements were contracts for municipal improvements and extensions in the new territory herein referred to as Greater Sarasota under and by virtue of the authority conferred upon the City by said Act of November 30, 1925, and existing legislation at the time empowering the City to contract for public improvements.

"Respondent further answering would respectfully show that the Old City limits of Sarasota include an area of about one square mile, and it was deemed necessary for the public welfare to increase said area that the City might expand and obtain additional credit in financial and banking circles. That the area as enlarged under the act of November 30, 1925, is approximately sixty-nine (69) square miles, but about one-fourth of this is Sarasota Bay and harbor."

The demurrer interposed by the relator to the answer charges that Chapter 11724 is void because the boundaries of the territory therein sought to be described are too indefinite and uncertain to enable the court to say what territory was intended by the legislature to be included. Also that the act violates sections 1, 4 and 12 of the Declaration of Rights, in that it embraces rural territory far removed

from the conveniences and advantages of city life, which will be taxed to support the city government of Sarasota, thereby denying property owners therein the equal protection of the laws and the enjoyment of their property, and denying them the benefit of resort to the courts for the injury done to said lands by the constant taxation thereof for city purposes without the possibility of receiving any benefits, and also depriving them of their property without due process of law, and that such taxation amounts to the taking of property without just compensation. The demurrer further charges that the act violates Sections 1 and 5 of Article IX of the Constitution in that the real property, too remotely located from the built-up portion of the municipality to receive any benefits therefrom, cannot have a just valuation as a basis of assessment for municipal purposes, and yet, being included within the corporate limits, such property will have to be assessed.

BROWN, C. J., (after stating the facts) :

The demurrer to the answer raises two primary questions: (1) Whether the description of the territorial limits is so indefinite as to render the act invalid, and (2) whether the act is rendered unconstitutional by including within the territorial limits some sixty-odd square miles of territory, many sections of which are sparsely or wholly uninhabited.

I. As to the first question, the charge of uncertainty is based on the description of the eastern boundary—especially by reason of the inclusion of the words indicated by italics in the following quotation from the act:

"Running thence South on the range line between ranges eighteen (18) and nineteen (19) to *Township* 37, *thence on the township line to the Northeast corner of Township* 37, *thence South on the range line to* the Southeast corner of Section 25 in Township 37 South, Range 18 East;" etc.

In fact, the italicized portion might be confined to the words, *"thence on the township line to the Northeast corner of Township* 37*,"* which, if omitted, would unquestionably leave a description of an unbroken section boundary line.

It is contended that these italicised words might, standing alone, denote a line running East along the Northern boundary of the tier of townships in Township 37, to the Atlantic Ocean, but that inasmuch as the title and language of the act confine the description to Sarasota County, the words quoted must denote a line running East from the Northeast corner of said Township 37 in Range 18, to the Northeast corner of said Township in Range 19, six miles distant.

It is obvious that the only way to supply the call next succeeding the italicized words above quoted, so as to comply with language of such succeeding call, would be to run a line South on the range line between ranges 18 and 19, which would strike the "Southeast corner of Section 25 in Township 37 South Range 18 East," which means that one would have to go back to the original point where the eastern bounary line, following the range line between Ranges 18 and 19, running South, strikes said Township 37, (being the Northeast corner of Township 37, Range 18) and this would mean a straight, unbroken boundary line marking the Eastern boundary of the municipal territory. It is impossible to follow the italicized call, "thence on the township line to the northeast corner of Township 37," and then run "South on the range line to the Southeast corner of Section 25, in Township 37, South, Range 18 East." So the effect of these italicized words is to run a dead-end line out from the eastern boundary, which encloses nothing, and leaves the eastern boundary line unbroken.

If a surveyor, by applying the rules of surveying, can locate the land as described in a deed, the description is

sufficient; and a deed will be sustained if it is possible to ascertain and identify the land intended to be conveyed. Ansley v. Graham, 73 Fla. 388, 74 So. 505, and cases cited. The government rules do not require the location of boundaries to be ascertained by tracing the line from the starting point merely. It is permissible to begin at any definite corner or monument, and run a reverse course if necessary to harmonize all the calls of the description. Ayres v. Watson, 137 U. S. 584, 34 L. Ed. 803; Simmons Creek Coal Company v. Doren, 142 U. S. 417, 35 L. Ed. 1063.

Applying this principle, by following the description of the eastern boundary line from its beginning at the Northeast corner of Section 1, Township 36, South, Range 18 East, thence South on the range line between Ranges 18 and 19 to Township 37, which means, of course, the North boundary line of Township 37 at a point on the range line between Ranges 18 and 19, and then go down to the Southeast corner of the tract of land described by the act, and, reversing the description, begin at the Southeast corner of Section 25 in Township 37 South, Range 18 East, thence run North on the range line to the North line of Township 37, we find that the line from said Southeast corner of Section 25, running North, strikes the Northern boundary line of Township 37 at the same point where the line running South from the Northeast corner of Section 1, Township 36 South, Range 18 East, above described, also strikes said line, thus tying in and enclosing the eastern boundary line as one continuous straight line, following the range line, from the Northeast corner of Section 1, Township 36 South, Range 18 East, to the Southeast corner of Section 25, Township 37, South, Range 18 East. This harmonizes with the manifest purpose of the act, for in the first part of the description set forth in the act we find this language: ''All that portion of Sarasota County bounded on the North by the Manatee County line, on the East by a line running

North and South on range line, beginning at the Northeast corner of Section 1 of Township 36 South, Range 18 East, running thence South on range line between Ranges 18 and 19," etc.   This shows that the words, "thence on the township line to the Northeast corner of Township 37," above referred to, appearing in the act, are superfluous and ineffectual.   It is idle to speculate on how and why they were included in the act.   Suffice it to say that, applying the ordinary rules of surveying, pertaining to the running of boundary lines, as well as the dictates of common sense, the description as a whole, as contained in the act, clearly describes and encloses a definite area or tract of land.   All reasonable presumptions must be indulged by the courts in favor of the validity of legislative enactments, and the rules with reference to the construction of descriptions of municipal territory in acts of the Legislature are more liberal than those applying to descriptions in notices of incorporation and resolutions adopted by incorporators of municipalities under our general laws.   In Lane v. The State, 63 Fla. 220, 57 So. 662, it was said: "Where the descriptions of territory incorporated as a municipality by a special law does not utterly fail to cover some area, and the description is not so uncertain as to make it impossible to determine the territory intended to be included in the municipality, the law is not void for uncertainty of description."

It is apparent, therefore, that those grounds of the demurrer to the answer attacking the sufficiency of the description of the municipal territory, as described in the Act of November 30, 1925, are not well founded.

II.   Now as to the second question, or group of questions, raised by the demurrer.   Eliminating the bay and Keys, the mainland included within the city limits, as extended by the act, is seven miles wide on the North, eleven miles long on the East, and about $3\frac{1}{8}$ miles wide on the South,

the western boundary being the shore line of the mainland
running in a northwesterly direction from the Southwest
corner to the Northwest corner, comprising some sixty or
more square miles, and containing approximately 15,000
inhabitants, 5,500 of whom reside in the old city, as estab-
lished by the act 1913, Chap. 6768, the old city comprising
territory about 1¼ miles square, the assessed value of the
taxable property therein being over $56,000,000.00.   The
extended territory includes some twenty subdivisions, pop-
ulation not given, most of them located within a mile or so
of the old city, and also the Town of Sarasota Heights, im-
mediately south of the old city, which act abolished and
merges with the City of Sarasota.   The answer discloses
that in the eastern three-mile strip of the extended limits,
containing thirty-three square miles, there are 230 houses,
85 one-room houses, and 46 tents.   Several sections in this
strip have one to a half-dozen houses, many less than a
dozen, and seventeen sections contain no houses at all, being
unimproved and uncultivated lands.   It is also alleged that
since the passage of the act and before any proceedings
were commenced the city had entered into contracts for
extensive improvements in some portions of the extended
territory, involving large sums of money.

It therefore appears from the answer of the City that
the municipal limits as extended by the act embraces, a
considerable area of rural lands, seventeen square miles of
which are uninhabited, uncultivated and unimproved, and
mostly situated at some considerable distance from the
built-up portion of the city.   It does not appear from the
petition for the writ, or elsewhere in the record, that any
of the owners of these vacant rural lands are objecting to
their inclusion within the municipal limits; nor are any of
them joined as co-relators.   The petition follows the usual
form, where the Attorney General is the relator and with-
out attempting to state the grounds of illegality, merely,

charges, in the name of the State, that the respondent city has been and is, without lawful authority, usurping and assuming to exercise corporate powers and privileges over the described territory, and prays that due process issue to said municipal corporation requiring it to answer the State by what authority of law it claims to exercise such jurisdiction, and that, upon hearing in due course, it be ousted therefrom. So it appears that here relief is asked, not in behalf of private rights of persons or property, none being expressly asserted, but in behalf of the State of Florida. The question therefore arises whether the private constitutional rights, if any, of the owners of the rural lands in said three mile strip to equal protection of the laws, due process, etc., raised by the demurrers, can be considered on this state of the record. The demurrer alleges that the act is void because it violates secs. 1 and 4 of the Declaration of Rights, in that rural territory, far removed from the conveniences and advantages of city life, will be taxed to support the city government, thereby denying the owners thereof equal protection of the laws and the right to resort to the courts for the injury done by such taxation. But for aught that appears in this record, none of such owners are claiming such equal protection. For all that the court knows, the owners of these rural lands may also own land in the built-up portion of the city and reside therein, and may desire the extension of the city limits on account of their belief that it may increase the growth and prosperity of the city and hence increase the value of the property therein, and of the outlying rural property as well. One can hardly be said to be "denied" something that he does not ask. Admitting for the sake of argument that the act will result in increased taxation on the rural lands without any corresponding benefit thereto and further admitting for like

reason that this will entail unequal protection of the laws in violation of the state and federal constitutions, do the pleadings before us, in the absence of any showing as to objection by the owners, bring this question properly before the court for adjudication? Can such objection be assumed or implied in a case like this?

This requires some consideration of the scope of the inquiry under such a proceeding as this, some general idea of which may be obtained by a brief review of the principles recognized by the former decisions of this and other courts. "*Quo warranto* is now regarded as a civil rather than a criminal remedy, and the pleadings are governed generally by the rules applicable to ordinary civil proceedings." State v. Gleason, 12 Fla. 190; 17 Encyc. Pldg. & Prac. 457; 32 Cyc. 1447; State v. Tampa Water Works Co., 57 Fla. 533, 48 So. 639; Buckman v. State, 34 Fla. 48, 15 So. 697. The Statute of Anne (9 Chap. 20) on the subject of informations in the nature of *quo warranto*, the successor of the ancient prerogative writ of *quo warranto*, in cases of usurpation or intrusion into public offices or franchises, forms the basis of the remedy in England and in this country, except as modified by statute. 17 Encyc. Pldg. & Prac. 393; 32 Cyc. 1413. It is generally regarded as the exclusive remedy to test the title to a public office, or the legal right to be a municipal or other corporation or to enjoy and exercise a corporate franchise granted by the State, i. e., the legal existence *vel non* of corporate franchises derived from the State, and thus to oust all usurpers of public offices and franchises. 17 Encyc. Pldg. & Prac. 393 to 412; 32 Cyc. 1419-28; State *ex rel.* Merrill v. Gerow, 79 Fla. 804, 85 So. 144. As private corporations derive their existence and franchises from the State, this remedy is available to test conflicting claims of title to an office in such corporations. Davidson v. State, 20

19—Vol. 92.

Fla. 785; Gentry-Futch Co. v. Gentry, 106 So. 473.    Our statutes, Sections 3581-4, R. G. S., provide, *inter alia,* that where the Attorney General refuses to institute the proceedings, in the name of the State on the relation of the *claimant to an office,* such claimant may himself file the information in the name of the State, and the judgment shall be conclusive between the parties, but not binding on the State.    The general common law rule is, that a private individual, without the intervention of the Attorney General, cannot, either of right, or by leave of court, file an information in the nature of *quo warranto,* but under the statute of Anne, informations were permitted to be filed upon the relation of any person interested in the subject matter of the proceeding, and statutory provisions of a similar character are very generally in force in the United States.    Under these acts a distinction is made between usurpations which affect public rights alone, and those which primarily affect some private right, though they at the same time involve the usurpation of a public franchise, in the latter case as information being allowed on the relation of the person whose rights are affected.    17 Encyc. Pldg. & Prac., 429-30.    Where the action is grounded upon alleged usurpation or misuser of a franchise, it must be one of a public nature, for the State will not interfere to determine mere private rights in which the public has no interest.    32 Cyc. 1419.    In State v. Gleason, 12 Fla., on p. 212-3, it was said: "At common law, no one but the law officers of the crown could sue out the writ of *quo warranto* * * * This writ at an early day, gave place to the more convenient proceeding of an information in the nature of a *quo warranto.*    It was the practice of officers of the crown to file informations in their own discretion, upon the application of private persons;; but these were not named as relators in the proceedings. * * *

The Statute of 9 Anne, ch. 20, required *that in informa-tions relating to corporate offices or franchises the name of the relator should be mentioned in the information."* (Italics ours.) The right to exercise a municipal franchise can not be challenged by the individual citizen. The right to be a municipal corporation is a franchise which the state may grant or withhold at its pleasure, and the right to institute proceedings against an existing *de facto* municipal corporation to arrest the usurpation of such a franchise by filing an information in the nature of a *quo warranto,* the substitute for the ancient prerogative writ of *quo warranto,* is in the discretion of the Attorney General. Robinson v. Jones, 14 Fla. 256; State ·v. Gleason, *supra;* Dillon on Munic. Corp., 5th Ed., Section 1560. Injunction does not lie to test the legal existence of a corporate franchise. Mr. Donald v. Rehrer, 22 Fla. 198; Bateman v. Fla. Commercial Co., 26 Fla. 423, 8 So. 51; Crawford v. Bradford, 23 Fla. 406; 7 Encyc. Pldg. & Prac. 416. The mention in the information of relators other than the Attorney General in a case involving the right to public office is mere surplusage. State v. Bryan, 50 Fla. 293, 39 So. 929. No collateral attack can ·be made upon the existence of municipal corporations. Enterprise v. State, 29 Fla. 128, 10 So. 740; Albuquerque v. Water Co., 5 A. L. R. 519; 17 Encyc. Pldg. & Prac. 408. It was said in State *ex rel.* Atty. Gen'l. v. Bryan, 50 Fla. 293, p. 350; "Under the laws of this State, the Attorney General is as much the representative of the State of Florida in the Supreme Court as the King's Attorney General is his representative in the Court of King's Bench; indeed, more so, as in the Court of King's Bench there are for certain causes representatives of the King other than the Attorney General; while here, it is his sole duty to 'appear in and attend to, in behalf of the State, all suits or prosecutions,

civil or criminal, or in equity, in which the State may be a party, or in any wise interested, in the Supreme Court of this State.' '' *Quo warranto* proceedings in the name of the State are generally recognized as the proper method of seeking relief where a municipality undertakes to exercise control over disputed territory. State v. Hutchinson, 102 Kan. 325, 169 Pac. 1140; State *ex rel.* Tillamood Port, 62 Or. 332; 124 Pac. 637. McQuillin Munic. Corp., sec. 158, 159, 2531; State v. Dimond, 44 Neb. 154. Where usurpation of a public office or franchise is claimed by the State, and an information in the nature of a *quo warranto* is filed by the Attorney General to test the right to hold such office or enjoy such franchise, it is only necessary to allege generally that the person holding the office or enjoying the franchise does so without lawful authority, and in such a case, as against the State, it devolves upon the respondent to show a complete legal right to enjoy the privileges in question. Enterprise v. State, 29 Fla. 128, 10 So. 740; 17 A. & E. Encyc. of Pldg. & Prac., 467. The respondent's plea or answer must contain allegations of all such facts as are necessary to show authority for the use of the franchise. 32 Cyc. 1455. See generally 17 Encyc. Pldg. & Prac. pp. 428-435. In some of the states, where a municipality is required or allowed to legally tax farm or rural lands within its limits at a different rate from that assessed against property in the built-up portions of the city, the remedy by injunction is permitted where the same tax rate is imposed on such outlying lands receiving no city benefits as to those that do; but such remedy is not available in this state, where all property within the municipal limits must be taxed at an "equal and uniform rate," and upon a "just valuation." Art. 9, sections 1 and 5, of State Const. Injunction, however, may lie, in proper cases, to enjoin the unlawful or uncon-

VOL. 92, JUNE TERM, 1926. 581

State of Florida ex rel. Johnson v. City of Sarasota—Opinion of Court.

stitutional use of powers granted by the State, though it cannot be used to test the legal existence of public or corporate franchises.

The rule is a familiar one that the constitutionality of an act cannot be questioned by a party whose rights are not affected by its enforcement. One who is not himself denied some constitutional right or privilege cannot be heard to raise constitutional questions on behalf of some other person who may at some future time be affected. Adams v. Am. Agri. Chem. Co., 78 Fla. 362, 82 So. 850. In the case of Clark v. Kansas City, 176 U. S. 114, 44 Law Ed. 392, it was held, under a law permitting cities to annex territory, excepting lands *used* for agricultural purposes *when not owned by a corporation,* that this discrimination between individuals and corporatons and alleged denials of equal protection of the laws could not be raised by a corporation as to defeat the annexation of lands of the corporation *not used* or held for agricultural purposes. This was a suit to restrain the collection of taxes, but no question was raised as to the appropriateness of the remedy. See also Trenton v. N. J., 262 U. S., 182, 67 Law Ed. 937. While not a *quo warranto* case, and hence not strictly analogous to the case at bar, it is not out of place to call attention to the case of Orlando v. Orlando Water & Light Co. *et al.,* 50 Fla. 207, 39 So. 532, the only Florida case where annexation of territory was defeated upon grounds similar to those raised by relator's demurrer to the city's answer in this case. The questions were raised by objections to an attempted annexation of territory under the general law. The headnote reads: ''Where the objections to the extension of the territorial limits of a city filed under Sec. 722 of the Rev. Gen. Stats. of 1892 are that the district proposed to be annexed is sparsely settled with less than ten registered voters and is remotely situated from the thickly settled portions of the city, that it would receive no advantages of lights and

police protection, that it would be in no way benefited by annexation, but would be burdened with additional taxes without benefit therefrom, and that the residents of said district prefer to remain in the country, and where all parties were heard on the merits, no exception being taken to the character of the objections, and where it does not appear that the Circuit Court abused the discretion vested in it by the statute in sustaining the objections as filed, the ruling of the court, sustaining the sufficiency of the objections on a motion for new trial will not be disturbed.'' It will be noted that in that case the interested parties brought their objections before the court and expressed their opposition to the annexation of their property. It is true that the owners of the rural lands here involved cannot be heard directly, and in their own names and right, as individual citizens cannot question the validity of a corporate franchise granted by the State. In order to protect their personal constitutional right, if any, individuals affected by the usurpation of a public franchise must secure the institution of *quo warranto proceedings,* in appropriate form, in the name of, and by, the State, or the proper amendment of proceeding already pending, where such is permissible in *quo warranto* proceedings, so as to bring their rights before the court. State v. Gleason, 12 Fla. 190.

In the case at bar, the charge by the State in the information against the City is in general terms, alleging the usurpation of corporate rights and privileges without authority of law, presumably the State by its Atorney General is acting for the State and its people as a whole, nothing appearing to the contrary. 17 A. & C. Encyc. of Pldg. & Prac. p. 428. The City by its answer sets up, as justification, an act of the state legislature, complete, valid and constitutional on its face, together with allegations of fact showing the general character of the lands within the

boundaries of the City as extended by the act, which allega-
tions disclose that such extension embraces a quite con-
siderable area of uninhabited and unimproved rural lands.
To this answer the relator, Attorney General, demurs, upon
the grounds hereinabove stated, setting up that the in-
clusion of such rural lands renders the act unconstitutional,
not because of conflict with any right or interest of the
State, but because it will, by reason of taxation for munici-
pal purposes from which said lands will receive no benefit,
violate the private constitutional rights of the owners of
such lands by denying the equal protection of the laws,
the taking of private property for public use without com-
pensation, etc.  These grounds of demurrer, it not properly
appearing in the pleadings that the persons affected are
claiming such constitutional rights or are objecting to the
inclusion of their property within the city limits, we con-
clude the State has not placed itself in a position to assert,
and that such demurrer is not well taken—unless it can be
held that the answer itself is insufficient in that it does
not affirmatively show that the owners of such rural lands
do not object to their inclusion within the city limits.  It
must be conceded that the answer of the respondent must
show a complete legal right to the enjoyment of the mu-
nicipal franchise over said lands.  But does not the answer
comply with this rule when, in reply to an information and
writ running in the name of the State and asserting no in-
dividual rights, it sets up a legislative enactment, valid on
its face, conferring such franchise?  We think so.  The
answer need not have gone further; as all reasonable pre-
sumptions must be resolved in favor of the validity of an
act of the legislature, and there being nothing in the title
or body of the act which patently appears contrary to the
constitution, the act itself was a sufficient answer to the
information as framed.  If indeed there be a latent uncon-

stitutionality, capable of being shown *aliunde,* growing out of the invasion of the individual rights under the constitution of that portion of the public owning lands in the rural section embraced by the act which they desire to claim and enforce, it was within the discretion of the Attorney General, in the name of the State, to have acted in their behalf and to have asserted such claims by appropriate allegations in the information and joining them as co-relators if desired, (though this latter was probably not essential) ; otherwise such private citizens would be without remedy.   But as the alleged rights mentioned, while arising by reason of the alleged unlawful assertion of a municipal franchise, are primarily individual, not accruing to or concernig the State, as a State, nor the people of the State as a whole; and as the Attorney General, when he files an information in this general form is presumably acting for the State and for the enforcement of the rights of the sovereign to put a stop to the unlawful usurpation of a franchise as against the rights of the State, we must hold that the answer in this case is sufficient, to the information, and the writ granted therein, in their present form.   This must be true, unless the mere inclusion of the rural lands, irrespective of individual organic rights, or their assertion, renders the act unconstitutional.

Can it be said that the mere extension by legislative act of municipal boundaries so as to include a considerable body of rural lands, without more, and, so far as the record discloses, without any objection on the part of the landowners affected, is in and of itself enough to render the act unconstitutional and void?   This is the first time this court has been confronted with this question, but in the light of its former decisions, the answer is not difficult.

Sec. 8 of Article VIII of our constitution vests the legislature with very broad powers with regard to municipali-

ties. The power so vested "to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time," necessarily implies the power to establish and alter the boundaries or limits of territorial jurisdiction. And even if this were not implied from such language, the legislature would have this power anyway, the same not being denied or limited elsewhere by the constitution. As was said in Robinson v. Jones, 14 Fla., p. 258: "So, in this country, the right to be a municipal corporation does not emanate from the citizen. It is a franchise which the State grants or withholds at its pleasure; nor does the existence of a municipal corporation necessarily depend upon any assent of the persons inhabiting the locality proposed to be invested with such franchises, powers or duties. This is a matter of pure legislative discretion, as it is entirely within the power of this department of the government to force that capacity upon such persons by positive legislation to that effect." And it was held in the case of State ex rel. Atty. General v. Johns, et al, decided at the present term, that, "The legislature has plenary power over municipalities except as restrained by the constitution." There is no provision of our constitution which seeks to limit or regulate the exercise by the legislature of the power of prescribing municipal boundaries. Of course, such power must be exercised in harmony with, and not in violation of, the other provisions of the constitution, such as those contained in sections one and four of the "declaration of rights" of individuals, but great latitude must be accorded to the legislative discretion in the exercise by the legislature of the practically plenary power expressly granted it by Section 8 of Article VIII. It is said in Dillon, Munic. Corp., 5th ed., in Section 353: "Indeed, the necessity for such corporations springs from

the existence of centres of agglomerations of population, having, by reason of density of numbers, local or peculiar interests and wants, not common to adjoining sparsely settled or agricultural regions. It is necessary to draw the line which defines the limits of the place and people to be incorporated. This is, with us, a legislative function. And, therefore, in a special charter incorporating a place, the boundaries of the legislature by its direct action thus to determine the extent of the geographical limits of the corporation is very broad, and in fact unlimited, except where the provisions of the charter are such as would contravene constitutional limitations, express or implied.'' In Section 355 of the same work, there appears: ''Not only may the legislature originally fix the limits of the corporation, but *it may, unless specially restrained in the Constitution, subsequently annex, or authorize* the annexation of, contiguous or other territory, and this without the consent and even against the remonstrance, of the majority of the persons residing in the corporation or on the annexed territory. And it is no constitutional objection to the exercise of *this power of compulsory annexation* that the property thus brought within the corporate limits will be subject to taxation to discharge a pre-existing municipal indebtedness, since this is a matter which, in the absence of special constitutional restriction, belongs wholly to the legislature to determine. The *power to enlarge the boundaries* of a municipality by the annexation of contiguous territory is an incident to the legislative power to create and to abolish municipalities at pleasure; and it is no objection to the exercise of this power, in the absence of constitutional restriction, that the territory annexed to a municipality already has a complete municipal organization as a city, borough, town, or village, or other corporate form recognized by the Constitution and laws of the

State.'' The notes to the text give copious citations. One of the cases cited is Kelly v. Pittsburg, 104 U. S. 78, 26 Law. Ed. 658, where it was held: ''What parts of a State shall, for local purposes, be governed by a county, a town or a city 'government, and the character of the land included in each, are matters of detail within the legislative discretion.'' See also Sections 108 and 1394 of the same work. In Section 108 it is said: ''The supremacy of the legislative authority over municipal corporations is not, however, in all respects unlimited; but the limitations must be sought either in the national or state constitutions; and except as there found, in terms or by fair implication, they do not exist.'' See also, 1 McQuillin Munic. Corp. Sections 265 to 278; 19 R. C. L. 732-3; 28 Cyc. 184 to 194, 286; where numerous cases are cited; also Clark v. Kansas City, 176 U. S. 114, 55 Law Ed., 392, and note; Utah v. Daniels, 5 L. R. A. 444, and note. In the case of McGuyer v. Tampa, ........ Fla. ........, 103 So. 418, it was said that Section 8 of Article VIII of the Constitution ''gives to the legislature full powers in forming municipalities, and the provisions of a statute on the subject control unless some other section of the Constitution is violated by the enactment. The express legislative authority to establish and to abolish municipalities and to prescribe their jurisdiction and powers obviously includes the power to annex territory to an existing municipality  *  *  *  The statutes confers governmental jurisdiction, not proprietary rights, upon the city in the annexed territory; and the validity of the enactment is not dependent upon the consent of the inhabitants of the annexed territory.''

The conclusion is inevitable that the mere fact that municipal boundaries are extended by direct legislative enactment, so as to include a considerable area of uninhabited and unimproved rural lands, does not *per se* render

such act unconstitutional. ''The reasonableness or justice
of a deliberate act of the legislature, the wisdom or folly
thereof, the policy or motive prompting it, so long as the
act does not contravene some portion of the organic law,
are matters for legislative consideration and are not sub-
ject to judicial control. The courts are bound to uphold
the statute unless it is clearly made to appear beyond a
reasonable doubt that it is unconstitutional.'' State v.
Bryan, 50 Fla. 293, 39 So. 929; Stewart v. DeLand-Lake
Helen Road District, 71 Fla. 158, 180, 71 So. 42.

The demurrer of the realtor to the City's answer must
therefore be overruled. It is so ordered.

ELLIS AND STRUM, J. J., concur;

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., con-
cur in the opinion.

WHITFIELD, J., concurring:

Except as to the overruled assertion that the charter
act is fatally defective in describing the territory sought
to be incorporated, the contention is that the charter stat-
ute includes besides small towns, great areas of wild lands
and also much sparsely settled territory so as to impose
municipal taxes thereon, when such property apparently
cannot be protected or benefited by the municipal govern-
ment, which if true would be a consequential injury pe-
culiar to the individual owners of such rural lands not ap-
pearing on the face of the statute and not affecting the State
or the public. *Even if* the Attorney General has a right to
maintain this proceeding on the ground of such conse-
quential injury to individuals, it is not duly shown beyond
a reasonable doubt that by the inclusion of such outlying
lands within the limits of the municipality, the charter

statute is such an arbitrary and oppressive abuse of legislative power and discretion and so invades the property rights of any complaining individual in violation of organic law, as to require relief to be given by the courts under Section 4, Declaration of Rights, or other organic provision (Getzen v. Sumter County, 89 Fla. 45, 103 South. Rep. 104), particularly in view of the express powers conferred upon the legislature by Section 8, Article VIII, of the State Constitution, relating to municipalities, which latter organic provision was not applicable in Consolidated Land Co. v. Tyler, 88 Fla. 14, 101 South. Rep. 280; Paul Bros. v. Long Branch and Lakeside Special Road and Bridge Dist., 83 Fla. 706, 92 South. Rep. 687.