STATE OF FLORIDA, ex rel., FRED H. DAVIS, Attorney General, et al., *Co-relators*, v. CITY OF STUART, a municipal corporation of Florida, *Respondent*.

En Banc.

Opinion filed January 30, 1929.

70

*Dame & Rogers,* for Relators;

*Edwin Brobston* and *Smith & Kanner,* for Respondents.

BROWN, J.—This is a case of original jurisdiction. An information in the nature of quo warranto, was filed in this court in the name of the State on the relation of the Attor-

ney General and some thirty odd co-relators, charging unlawful usurpation of municipal authority over the lands of the co-relators by the City of Stuart in violation of the constitutional rights of such co-relators, and prayed that the respondent City of Stuart be requested to answer by what warrant or authority it was exercising the powers and franchises of a municipal corporation over said lands. The allegations of fact, set out at considerable length in the information, will be discussed later. Briefly, the gravamen of the charge is that said lands are of a rural or suburban character, remote from the built up portion of said city and entirely outside the range of municipal benefits, existing or prospective, and that certain legislative acts extending the corporate limits of said City so as to embrace said lands and thus render them subject to City taxes for City purposes, under which the City is exercising municipal authority over said lands, are arbitrary, unreasonable and void as being in violation of the constitutional property rights of the co-relators owning the same.

The writ was upon order of this court issued as prayed, and the respondent filed a motion to quash the information, also a demurrer thereto, upon the ground that the legislative acts therein referred to are valid and unconstitutional, that no violation of the constitution is shown, and that the remedy of the co-relators is political and not judicial. Realtors then filed motion for judgment of ouster for lack of sufficient answer. Respondent was later permitted to file its answer, setting up its authority from said legislative acts, and alleging benefits to the property of the co-relators, by reason of being taken inside the City. Thereupon the Attorney General and his co-relators interposed a motion for judgment of ouster, upon the ground that, for reasons pointed out, the respondent had failed to make sufficient answer to the information.

The first question presented is one of pleading—that is, did the respondent have any right to attack the sufficiency of the information, after the issuance of the writ, by motion to quash and demurrer, in view of the fact that the Attorney General was a realtor therein?

The general rule is that, "where usurpation of a public office, or a franchise, is claimed by the State, and an information is filed by the Attorney General to test the right to hold such office or enjoy such franchise, it is only necessary to allege, generally, that the person holding the office or enjoying the franchise, does so without lawful authority, and in such a case, as against the State, it devolves upon such person to show a complete legal right to enjoy the privileges in question." Enterprise v. State, 29 Fla., 128, 140, 10 So., 740; Carson's Fla. Common Law Pldg., p. 191. As against the State, when the information contains only such general allegation of the exercise of a franchise without lawful authority, the respondent may meet this by setting up in its answer, as justification, an act of the legislature, complete, valid and constitutional on its face, which act authorizes the exercise of such franchise. If, for any reason *aliunde* the face of the statute, the same be deemed unconstitutional, such as that it was not lawfully adopted, or cannot be constitutionally applied to the subject matter thereof without contravening rights of persons or of property protected by the constitution, the Attorney General could set this up by replication to such an answer, or, if he prefers, he may do so to commence with, in the information itself. If he chooses to embrace such allegations in the information, the legal sufficiency thereof is as much subject to attack and test by demurrer or other appropriate pleading as they would be if set up by way of replication. Thus, Dr. Crandall, in his recent work on "Florida Common Law Practice," pages 672-3, pertinently observes: "Under Sec-

tions 3581, 3582, 3584, Rev. Gen. Stats., 1920, Sections 5446, 5447, 5449, C. G. L. 1927, it is clear that the Attorney General, if he prefers not to avail himself of the right to allege usurpations generally and call upon the respondent to show by what warrant he exercises the office or enjoys the franchise or privilege, may allege the specific facts relied upon in a manner similar to that required of a private person who files the information in assertion of his claim to an office. The effect of this would be to advance the pleadings one step, and is the method which the legislature evidently intended to be used where the Attorney General files the information upon the relation of a party claiming title to an office.''

Also, in Enterprise v. State, 29 Fla., 140, it was contended that while the information charged the respondents with the usurpation of municipal functions, it set forth facts which showed their right to exercise them, in this, that it was made to appear therein that while the two first efforts at incorporation were illegal, the third, under which they claimed, was valid. In this connection, the court said: ''We concede it to be a correct proposition that, if the information states the facts upon which the charge of usurpation is based, and those facts show a clear legal right in respondents, it would be insufficient. It was said in State ex rel. Law v. Saxon, *supra*, that the same general rules and principles of pleading enforced in civil actions also govern in *quo warranto* proceedings.'' In that case, the lower court was reversed because of its action in overruling the demurrer to the information. See also State v. City of Sarasota, 109 So. R., 473, 92 Fla., 563; 32 Cyc., 1458; State v. Saxon, 25 Fla., 342, 5 So. R. 801; Attorney General v. Connors, 27 Fla., 329, 9 So. R. 7. Under these authorities, we conclude that the legal sufficiency of an information such as the one here in question may be tested by demurrer. This holding

is not in conflict with State v. Kennerly, 26 Fla., 608, 8 So. 310; State v. Bryan, 50 Fla., 293, 39 So. R. 929; State v. Gleason, 12 Fla., 190. But the propriety of a motion to quash such an information is doubtful. In proper cases, a motion to quash the writ might lie. 32 Cyc., 1459.

If, as suggested by the relators, the allegations of fact, which form the basis of the charge of usurpation, might be treated as surplusage, because of the fact that the information is filed on the relation of the Attorney General, the relators might find themselves in the same situation as that disclosed in the tenth headnote to the case of State v. City of Sarasota, *supra.*

We must therefore consider the legal sufficiency of the information as brought in question by the demurrer. This raises the question which underlies the whole case—a question as difficult as it is important. And it is this: Is the action of the Legislature in establishing or extending municipal boundaries by direct legislative enactment subject to judicial review in any case, and if so, in what case or class of cases: And, particularly, is judicial review allowable where, as is here charged, the extension is unreasonable and arbitrary and takes in and subjects to city taxes rural territory far removed from the built-up portion of the municipality and entirely beyond the reach and range of municipal benefits?

A condensed summary of the information discloses the following facts:

Prior to the enactment of Chapter 11214 of the Laws of 1925, the then Town of Stuart embraced approximately 640 acres, a considerable portion of which was water. The town was located on the corner of land bounded on the north by the broad St. Lucie River and on the west by the south fork of that river, and the northern and western boundaries ex-

tended to the center of the channel of these two bodies of water. The population of the town was then about 2000.

Said Chapter 11214, approved May 21, 1925, purported to abolish the municipal government of the Town of Stuart, and to establish a Municipality designated as the City of Stuart, and to extend the boundaries so as to take in a considerable body of land eastward and southward from the former town limits, bounded on the north by the St. Lucie River and on the east by the same stream, which turns southward toward the sea about one mile east of the old town, the municipal boundary extending to the center of the river on the north and east.

During that same year, by an act approved Nov. 30, 1925, Chap. 11750 of the Laws of Florida, an attempt was made to further extend the corporate limits of the City of Stuart so as to take in a considerable body of land which included the lands of the relators located on the North side of the St. Lucie River, lying to the Northwest, North and Northeast of the area already incorporated, and extending Southward to the former Northern boundary of the City in the center of the river. This act also embraced a narrow peninsula, known as Sewell's Point, extending from the Southeast corner of the additional territory on the mainland and projecting Southward between the waters of the St. Lucie to the West and Indian River to the East. This peninsular was subsequently by another legislative act withdrawn and excluded from the municipality.

The effect of these two acts of the Legislature, if valid, was to increase the area of the municipality fifteen fold, that is, from around 640 acres to about 9,460 acres. The strip of land North of the River added by the second act, as indicated by the legal description contained in the act, and by the may attached to the information as an Exhibit, is about six miles long East and West but rather narrow and of

varying width North and South. The lands of the co-relators are contiguous and together comprise the Eastern one-third, approximately, of this territory North of the River. The information contains a description of the particular land owned by each of the thirty-odd co-relators.

One strange provision of this extending act is the express exclusion of three lots in Glutche's Subdivision from the municipality, although these lots are near the center of the territory added by this act and surrounded on all sides by lands included within the city by said act. The arbitrary exclusion of these three lots is not explained, but it appears from the information that these lots were the property of a lumber company.

Each of said acts provided that the property embraced therein respectively should be liable and subject to taxation for the existing as well as future indebtedness of the City of Stuart. The information further alleges:

That the territory hereinbefore described as belonging to the co-relators herein and embraced in that territory attempted to be incorporated in the City of Stuart by the Acts of the Legislature hereinbefore mentioned, are in each and every instance rural lands, far removed from the conveniences and advantages of city life, in many instances being isolated from the municipality proper and being situated in some instances six or seven miles from the built-up portion of said municipality, and although the same are assessed by the City of Stuart for taxation at a value greatly in excess of its real value, to-wit: in many instances in excess of $1,000.00 per acre, and the same are being taxed by the municipality of Stuart to support the City Government, and for the purpose of paying off indebtedness created by and for the sole benefit of the old munici-

pality prior to the attempt to incorporate said territory within the extended boundaries of said municipality, the said City of Stuart has made no improvements whatever on said property or any portion thereof by way of building streets, sidewalks, or roads, or the laying-out or grading or hardsurfacing of any streets or roads; that no sewers have been laid or water mains placed or poles or wires placed for electric lights in any of said territory; and that no improvements whatever have been made or are even in contemplation by the said municipality within said territory; that no benefits whatsoever have accrued to said property or any portion thereof, or to any of the owners of said property, and none are probable or contemplated, thereby denying said property owners the equal protection of the laws and the enjoyment of their property, and denying them the benefit of resort to the Courts for the injuries done to them and their said lands by the constant taxation thereof for City purposes, without the probability of receiving any benefits, and depriving them of their property without due process of law; that such taxation amounts to the taking of the property without just compensation, and is confiscatory and in violation of the property rights of the co-relators who are citizens of the State of Florida; that the said Acts of the Legislature and the exercising of corporate functions thereunder by the City of Stuart violates Sections 1 and 5 of Article IX of the Constitution, in that the property of the co-relators hereinbefore mentioned is too remotely located from the built-up portion of the municipality to receive any benefits therefrom, and cannot have a just valuation as a basis of assessment for municipal purposes, and yet, being included within the boundary of said municipality, such

property is necessarily being taxed for municipal purposes, thereby depriving the co-relators of their constitutional rights and privileges and denying them resort to the courts, in violation of their constitutional rights; that the said property of the co-relators is not and cannot be considered as a part of the community wherein the City of Stuart is located, by reason of the fact that it is separated from said municipality by St. Lucie River or Harbor, and is what formerly constituted the village of Rio, where a postoffice was formerly maintained by the United States Government, with its separate school and its separate community of interests; that since the usurpation of corporate rights, franchises and privileges over said territory by the municipality of Stuart, the postoffice at Rio has been abandoned and mail service is now provided for the residents thereof in the postoffice of Jensen, a municipality adjoining said lands on the north; that the residents of said territory now have no telephone connection with the City of Stuart, but such as are provided with telephone connections, are connected with the Town of Jensen; that a separate school is maintained in said neighborhood, separate and distinct from the schools of Jensen and Stuart, but closely associated with the Jensen schools by reason of Special Tax School District Trustees and otherwise; that in State and County elections, the residents of the territory hereinbefore described do not vote at Stuart, but are required to vote in Jensen; that telegrams and special delivery letters are not delivered to the residents of said territory by the Postal and Telegraph authorities at Stuart; that the municipality of Stuart furnishes no fire protection or police protection to any of said territory or any of the inhabitants thereof; that there are no

streets or roads leading to the places of residence of the co-relators, except country roads, and the same are not kept up or maintained by the City of Stuart; that said territory and the residents thereof are within the County Commissioner's District who lives at Jensen, and the County Commissioner living at Stuart refuses to hear complaints of said residents, but refers them to the County Commissioner living at Jensen; that said territory was included in the boundaries of the City of Stuart as extended by said Acts of the Legislature, against the wishes and over the protests of these co-relators; that there are but few residences or other improvements within the territory hereinbefore described as belonging to those co-relators, but in most instances said lands are wild, unimproved, undeveloped and in their natural and native condition, and in many instances unsuited for development for farm purposes; that the said lands are too remote from the business and residential section of the municipality of Stuart to derive any benefits therefrom, and are receiving no benefits whatever, either to said lands or to the owners thereof; that the only purpose of the attempted inclusion of said territory within the boundaries of the City of Stuart was that the same might be taxed to support the City Government of the City of Stuart, and to pay off the indebtednesses created prior to the time of their attempted inclusion and that were in nowise created for the benefit of such territory; that the territory hereinbefore described as belonging to these co-relators does not properly belong to the community comprising the municipality of Stuart, but it remote therefrom and inaccessible thereto, and is more accessible to the Town of Jensen, and that said territory has not been laid out upon a plan or as a part of

the municipality of Stuart, but such few residences as are located thereon, were built independent and without reference to the laying out of the municipality of Stuart."

It is further alleged that the population of the municipality has been but slightly added to by the inclusion of such territory. It appears from the map that there is only one vehicular bridge connecting the territory north of the river, embraced in the extension act, with the City of Stuart, the same being a bridge running northwestward from the northwest corner of the old Town of Stuart to a projection of the mainland across the broad waters of the river, and parallel with the railroad bridge. These bridges are some distance from the body of land to the northeast owned by the co-relators. These lands, it is alleged, are so remote from the developed portion of the City of Stuart that it could not have been contemplated that any improvements or benefits whatever would accrue to said lands or the owners thereof by reason of inclusion within the city limits. Lying between the bulk of the lands south of the river, incorporated under the first act, and those north of the river, added by the second act, are the waters of the river, which, excepting at the point crossed by the bridges, are quite wide—according to the map exhibit probably an average of one mile in width and designated as "Stuart Harbor."

Now, as to the sufficiency of the information as tested by the demurrer. Upon this inquiry, the allegations of fact must of course be taken as true. That the facts so alleged show that the Act of the Legislature extending the municipal boundaries across the river so as to take in the lands of the co-relators, was unreasonable, arbitrary and unjust, can hardly be denied. Whether the facts alleged make the information *prima facie* sufficient in law to show the statute

to be unconstitutional, as a basis for the relief sought, we will now proceed to consider.

If the relator and his co-relators are entitled to judicial relief of any sort, it must be conceded that they have chosen the proper, and probably the only, available remedy. See State ex rel. v. City of Sarasota, *supra*, in which case there was an unsuccessful effort to raise the very question, and obtain a decision thereon, that is now squarely presented. As was said in that case: ''In some of the States, where a municipality is required or allowed to legally tax farm or rural lands within its limits at a different rate from that assessed against property in the built-up portions of the city, the remedy by injunction is permitted where the same tax is imposed on such outlying lands receiving no city benefits as on those that do; but such remedy is not available in this State, where all property within the municipal limits must be taxed at an 'equal and uniform rate' and upon a 'just valuation.' Art. IX, Secs. 1 and 5, State Const.''

The case at bar should not be confused with that class of cases where the power to establish, alter or extend municipal boundaries is exercised, not directly by the Legislature, but by proceedings instituted under general laws, varying in their nature and regulations in the various States. In this class of cases, it is very generally held that the courts may determine the existence of the power attempted to be exercised by the local authorities and the validity of the mode of its exercise. Many cases of this class are reviewed in McQuillin Munic. Corp., 2nd edi., Secs. 285 to 309; 1st edi., Secs. 266 to 292, and in Dillon Munic. Corp., Secs. 353-357. While much is said in connection with this class of cases which has a bearing on the case at bar, they are not directly in point as regards the fundamental question here involved. Thus we have in this State general laws under which municipalities may, by following the prescribed procedure,

contract or extend their boundaries, subject to ratification by an election held in accordance with the statute. Or, in cases of extension of boundaries, where the tract desired to be annexed contains less than ten registered voters, the statute provides that the same may be accomplished by ordinance and publication thereof, without an election, subject to the right of the property owners in such tract within a limited period to object by petition to the circuit court, of which notice is given to the city and a hearing accorded. Secs. 3048-3051, Comp. Gen. Laws, 1927, Secs. 1915-1918, R. G. S., 1920. And in the case of City of Orlando v. Orlando W. & L. Co., 50 Fla., 207, 39 So. R., 532, arising under the last mentioned provision of the statute, the action of the circuit court in sustaining the objections of the property owners and preventing the annexation was affirmed. The objections in that case were that the district proposed to be annexed was sparsely settled and remotely situated; that it would receive no advantages and be in no way benefited by annexation, but would be burdened with additional taxes.

But we are dealing here with the direct action of the Legislature. And it must be conceded at the outset that the Legislature has the power to establish, alter, extend or contract municipal boundaries. This is the generally accepted doctrine throughout the country, whether the State constitution does, or does not, expressly vest the power in the Legislature. "It is necessary," says Judge Dillon (Dillon Munic. Corp., Sec. 343), "to draw the line which defines the limits of the place and people to be incorporated. This is, with us, a legislative function." If a constitutional recognition of this power over municipalities and their boundaries were necessary, it is abundantly furnished— and without any restriction on the exercise of it as to boundaries—by Section 8 of Art. 8 of our State constitution.

The existence of the *power* is freely conceded. But is that power *unlimited,* and the exercise of it entirely beyond the reach of judicial review in any and all cases? The weight of authority in this country seems to answer this question in the affirmative, and to hold that the legislative power in this regard is practically plenary and unlimited, in the absence of express constitutional restriction thereof. We have no such express restriction in our constitution. As was observed in the course of the opinion in the case of State v. City of Sarasota, *supra:* ''There is no provision of our constitution which seeks to limit or regulate the exercise by the Legislature of the power of prescribing municipal boundaries.''

In Dillon on Municipal Corporations, 5th Ed., Sec. 58, it is said that ''the general rule is that the determination of municipal boundaries is purely a legislative function,'' and Section 355 reads as follows:

> Not only may the Legislature originally fix the limits of the corporation, but *it may, unless specially restrained in the Constitution, subsequently annex,* or authorize the annexation of, contiguous or other territory, and this without the consent and even against the remonstrance of the majority of the persons residing in the corporation or on the annexed territory. And it is no constitutional objection to the exercise of *this power of compulsory annexation* that the property thus brought within the corporate limits will be subject to taxation to discharge a pre-existing municipal indebtedness, since this is a matter which, in the absence of special constitutional restriction, belongs wholly to the Legislature to determine.

The power to enlarge the boundaries of a municipality by the annexation of contiguous territory is an

incident to the legislative power to create and to abolish municipalities at pleasure; and it is no objection to the exercise of this power, in the absence of constitutional restriction, that the territory annexed to municipality already has a complete municipal organization as a city, borough, town, or village, or other corporate form recognized by the Constitution and laws of the State. In the absence of constitutional limitation upon the power of the Legislature, it is also no objection to the valid exercise of the power that a smaller municipality is, in practical effect, merged in and consolidated with a larger municipality by the act of the voters of the larger city, as where the question of consolidation is referred to a popular vote of the electors of the consolidated territory, a provision which almost of necessity refers the question to the practical determination of the electors of the larger of the two bodies intended to be consolidated. A consolidation so effected, unless prohibited by some express provision of the Constitution of the State, is not open to attack as depriving the taxpayers and electors of the smaller municipality of their vested rights or property without due process of law, either under the constitutional provision to that effect to be found in the Constitution of the State, or the similar provision to be found in the Constitution of the United States.

In Section 284 of McQuillin on Municipal Corporations, 2nd Ed., it is said:

Unless restricted by the Constitution, the Legislature may not only establish the original limits of municipal corporations, but may alter or change the boundaries at any time by directly annexing or detaching territory contiguous or otherwise, dividing or consolidating cor-

porations, or, it may authorize such changes to be made by general or special law unless forbidden by the Constitution, and this may be done without the consent and even against the protest of the corporation, the local authorities or the inhabitants of the communities affected. This is regarded as a purely discretionary legislative prerogative, and unless the obligations of contracts or vested rights of third persons are impaired by such action, in accordance with the well-established rule, the judiciary cannot interfere. But whether a municipal corporation has definite and certain boundaries, and what such boundaries are, is a matter for the determination of the courts, and not the Legislature, and in such case the justice or injustice of the action of the Legislature in fixing the boundaries is not involved.

Thus the Legislature has the power to extend the limits of an existing municipality by annexing territory thereto, although such territory will receive no benefit from incorporation in return for the municipal burdens thereby imposed upon it, and although annexed territory is thereby rendered liable for the pre-existing debts of the municipality. The extension of corporate limits, like the organization of municipal corporations, is ancillary to the government in sustaining the peace, the convenience, and the order of those communities which are formed by dense collections of citizens in particular localities. The public generally is concerned and the Legislature may prescribe the terms and conditions under which they may be formed or extended.

As to the inequality of taxation, when produced by an extension of boundaries, which in some States has been recognized as a basis for relief independent of the validity

of the extension *per se,* the following appears in Sec. 324 of the 4th edi. of Cooley on Taxation:

A different case has been presented in some other States. City boundaries having been extended so as to embrace the lands of parties who insisted that their premises were agricultural lands merely, and would receive no benefit from the city government, such parties sought the protection of the courts, and prayed for injunction to restrain the imposition upon them of any tax in excess of what they would have been chargeable with had the boundaries not been extended to embrace them. It is to be observed of such cases that the Legislature, which alone had authority to determine and fix the proper bounds of the municipal division of the State and also to establish the taxing districts, had proceeded to do so, and in fixing the city boundaries without any provision for a discrimination in the taxation of property within them, had in effect determined that no such discrimination should or ought to be made. The whole subject was one committed by the Constitution exclusively to the judgment and discretion of the Legislature, whose members, as in other cases of legislation, would make inquiry into the facts in their own way, and act upon their own reasons. No question could be made of the complete legislative jurisdiction over the case, and if the action was unfair, and led to unequal and unjust consequences, it seems difficult to suggest any ground upon which it could be successfully assailed in the courts that would not warrant a judicial review of legislative action in every case in which parties complain of injustice and inequality. Nevertheless in some cases the courts have considered themselves warranted in inquiring into the facts, in order to determine whether in their judgment the extension of mu-

nicipal boundaries was fairly warranted; and having reached the conclusion that it was not, and the extension was made for the purpose of subjecting to taxation adjacent property that would not receive the benefits of municipal government and was not in fact urban property, they have undertaken to protect the owners of property thus unfairly brought in, against the unequal taxation to which the legislation would expose them. In doing this they have not assumed to nullify the legislative action in extending the municipal limits, but they have undertaken to modify and relieve against its consequence, and to do this upon the express ground that the motive which has influenced the legislation was not legitimate. As the point is stated in one case, it is the palpable perversion of the power to tax which justifies the judicial interference.

Some of these decisions are made by very able judges, whose opinions are always entitled to the highest respect; but it seems difficult to harmonize them with the conceded principles governing the law of taxation. For, 1. They do not question legislation as being in excess of legislative authority, as might be done where taxes are voted for a purpose not public; but they leave the legislation to stand, and only interfere to qualify its effect, on the ground that it has been adopted on improper grounds and will operate unequally. 2. This is done on an inquiry into the facts, and a substitution of the judicial conclusion for the legislative on a subject not at all judicial; a subject, too—the proper limits of city extension—upon which persons are certain to differ widely, and where an inquiry into the facts after the judicial method of an examination of witnesses is usually much less satisfactory than that personal knowledge and investigation which

legislators are supposed to possess or to make. This is
certainly laying down a rule which cannot be applied
generally; it is being admitted that the judiciary has
no general authority to correct the injustice of legis-
lative action in matters of taxation; and the weight
of authority clearly is that, as regards these cases, the
determination of the legislature is conclusive. But the
legislature has no authority to bring into a municipality
territory not contiguous to it and the attempt to do so
for the purpose of increasing the local revenue may be
treated as void.

Numerous cases are cited by these text writers in support
of the propositions announced.

One of the leading cases cited is Kelly v. Pittsburgh, 104
U. S., 78, 26 Law Ed., 658. James Kelly was the owner of
80 acres of land devoted to farming and dairy purposes
only. The limits of the City of Pittsburgh were extended
so as to embrace a large tract of country composed of farm
lands. Kelly's land was surrounded on all sides by other
farm lands except a parcel of twenty acres laid off into lots.
Between his land, and the city lay other farm lands. It lay
distant from gas and water pipes, lights, sewers, police beats
and fire apparatus. No city streets led to it. Brought into
the city without his consent, it was taxed $2117.00 on a
valuation of $244,000.00 for city purposes alone, while the
productive yearly value as a farm was $10.00 per acre, or
$800.00 for the whole. He filed a bill in equity in the State
court to restrain the city from taxing his property for city
purposes, and alleged that his property was taken into the
city for the purpose of increasing its revenues and without
any pretext of extending any benefits to him. The trial
court decided the case against him and he appealed to the
Supreme Court of the State. This court affirmed the de-

cree of the lower court, Chief Justice Agnew, joined by Justice Sterrett, filing a vigorous dissenting opinion. The case was then carried to the Supreme Court of the United States on writ of error. This high tribunal also found against Kelly, affirming the judgment of the State Supreme Court. In its opinion the federal Supreme Court held that the only argument that Court could consider was that the proceeding in regard to the taxes assessed against plaintiff's land deprived him of his property without due process of law. In discussing the contention that the State law involved was itself in conflict with the constitution, the Court, speaking through Mr. Justice Miller, said:

It is not denied that the Legislature could rightfully enlarge the boundary of the City of Pittsburgh so as to include the defendant's land. If this power were denied, we are unable to see how such denial could be sustained. What portion of a State shall be within the limits of a city and governed by its authorities and its laws has always been considered to be a proper subject of legislation. How thickly or how sparsely the territory must be settled so organized into a city, must be one of the matters within the discretion of the legislative body. Whether its territory shall be governed for local purpose by a county, city or township organization, is one of the most usual and ordinary subjects of State legislation.

It is urged, however, with much force, that though land of this character, land which its owner has not laid off into town lots, but which he insists on using as agricultural land, through which no streets are run or used, cannot be, even by the Legislature, subjected to the taxes of a city, the water tax, the gas tax, the street tax, and others of similar character. The reason for this is said to be that such taxes are for the benefit of

those in a city who own property within the limits of such improvements and who use, or might use them if they choose, while the owner of this land reaps no such benefit. Cases are cited from the higher courts of Kentucky and Iowa where this principle is asserted, and where those courts have held that farm lands in a city are not subject to the ordinary city taxes.

It is no part of our duty to inquire into the grounds on which those courts have decided. They are questions which arise between the citizens of those States and their own city authorities, and afford no rule for construing the Constitution of the United States.

The opinion then goes on to say that it is not possible to adjust with precise accuracy the amount which each individual in a civil community shall contribute to sustain the organization. That the taxes were levied for public purposes and that the court could not judicially say that Mr. Kelly was without benefit from the city organization. That the city schools would receive his children; that the city streets, while not penetrating his farm, lead to it; that the waterworks would probably reach him some day, and that he had an interest in the protection afforded by the police. "Clearly," says the court, "these are matters of detail within the legislative discretion, and therefore, or power in the law-making body within whose jurisdiction the parties live. This court cannot say, in such cases, however great the hardship or unequal the burden, that the tax collected for such purposes is taking the property of the taxpayer without due process of law." See also Clark v. Kansas City, 176 U. S. 114, 44 Law edi. 392.

The case of State v. Brown, 53 N. J. Law R., 162, was one where a village tax on farm land was resisted. It was asserted that the village only occupied one-third of the territory included within the corporate limits and that the

farm lands obtained no benefits. In the course of a very able opinion, the court said:

In respect to this claim for immunity, there are a number of cases in the courts of Iowa, Kentucky and Nebraska in which the invalidity of such a tax is adjudged. The courts in these cases, by injunction or other process, have stepped in and arrested the proceedings to collect, on the ground that it was taking private property for public purposes without compensation; that it was confiscation and not taxation. Except in the courts of the States mentioned, the doctrine thus promulgated has no support in the jurisprudence of this country. The power of the Legislature to fix the territorial limits of municipal corporations has never been doubted; indeed, it is not questioned in the cases above noted. The power of the Legislature to authorize the levying of taxes for any public purpose upon all the property within the municipality is indeed denied in those cases, but nowhere else.

The ground upon which the court went was, that no benefit accrued to the party assessed, so his land, by reason of that, was non-assessable. They imported into the levy of a general tax the question of benefits to the taxpayer. If he was benefited, he could be assessed; otherwise, not.

It is perceived that if the matter of benefits to the taxpayer becomes a judicial problem, the courts cannot halt at the line of no benefits in dealing with general tax levies. The logical result of a judicial intervention at all carries the boundary of supervision into all degrees of benefit. Is he benefited to the amount of the tax levied? If not, how much is he benefitted, and a proportional abatement?

The admission of such a power of inquiry would be entirely novel, and would overwhelm the courts with the duty of tax revision.

Actual benefit lies at the foundation of a valid special assessment for local improvements. In the case of general taxation for governmental purposes benefit is presumed to accrue to all. But it does not accrue to each one in the same manner or in equal degree. Inequality is the rule arising out of the inevitable variations of personal environment. Hundreds are assessed in a city for the expenses of electric lights who have to content themselves with gas or nothing; for public parks, which are located on the opposite side of the city, and are practically unreachable for the purposes of recreation, and for police, when such an officer is rarely visible. Many of the levies for the support of these and similar features of municipal government are as inequitable as the levy of urban taxes upon rural property. It has never been successfully urged that, because of the inequality of return, the tax was abatable.

The courts which have enjoined the collection of taxes upon agricultural land assessed for municipal purposes have not intimated that they would enterain jurisdiction of cases of taxation where there was some but not an adequate benefit.

In the case of Norris v. Waco, 57 Tex., 635, it was held that, so far as the Legislature itself is concerned, its power is generally recognized to be absolute, in the absence of some constitutional provision directly controlling the matter. That what territory shall be embraced wihin a municipality is a political question to be determined by the law making power; and that an attempt by the judiciary

to revise the legislative action would be a usurpation of power.

It is believed that the above quotations give a fair compendium of the reasoning underlying the numerous cases supporting the majority view that the legislative power in this regard is absolute and unlimited, and not subject to judicial review. They come from such high sources as to compel respectful consideration. But, as forcible, persuasive and even brilliant as some of these arguments in behalf of the majority view are, their thoughtful perusal, and especially the conclusion arrived at, leaves something to be desired. One cannot suppress the thought that if this view be accepted without qualification and followed to its logical conclusion, what may the legislature not do, by way of arbitrary extension of municipal boundaries, to place the major part of the burden of taxation to support a municipality upon property owners whose lands and other property are so far removed from the range of local municipal conveniences and advantages as to completely repeal any pretext of benefit therefrom. And if this doctrine be fully adopted, what becomes of those sacred and basic rights of person and property, which have their roots deep in the past and which the people of America have sought to safeguard in the bills of rights which have been embedded in all their State constitutions, and to some extent in the Federal constitution itself—inalienable rights, some of which run back to Magna Carta, and which have long been cherished as out chief existing guarantees of individual liberty and private property, the natural heritage of every free American citizen? And what becomes of our boasted claim that nowhere in our system of government is there provided a place for absolute, arbitrary and despotic power? At the least, that there is in our government no place for the exercise of arbitrary or unlimited power, by any of its

departments, in such a way as to run rough shod over, or to encroach upon, those vital rights of the citizen which have been deliberately retained and reserved to the people, and preserved by our constitutional guarantees from invasion or impairment by governmental power of any kind, whether legislative, executive or judicial. The courts of this country have been very careful not to encroach upon the domain of the legislative and executive departments. It is highly important that they sedulously continue to follow this course and keep strictly within their own proper sphere. See Jackson Lumber Co., v. Walton County, 116 So. R., 771, 789. But it is of the first importance, and their highest duty, and within their proper function, to maintain the integrity of the constitutions they have sworn to defend and support. Jurists, as well as statesmen, might well remember the significant admonition of John C. Calhoun, who speaking in the United States Senate, said: ''Of the few nations who have been so fortunate as to adopt a wise constitution, still fewer have had the wisdom long to preserve one. It is harder to preserve than to obtain liberty. After years of prosperity, the tenure by which it is held is but too often forgotten.''

If it be true that the legislative power over municipal boundaries is absolute and unlimited, in the absence of a specific provision in the constitution as to how and when it should be exercised, the door is open for harsh and ruthless invasions of those individual rights we have been speaking of, and without remedy. Let us suppose, for instance that a town of say a thousand population should make extensive municipal improvements resulting in burdensome taxes, and should then procure a legislative act taking within its corporate limits a narrow strip of land running out to and embracing a community of half a dozen families two or three miles away, each family owning and cultivating large

and valuable orange groves, located entirely beyond the reach of municipal benefits, and thus impose half the tax burden of the town on such remotely located groves, could such an arbitrary and oppressive act, so located invading property rights, be held valid? And yet it would be so held, if the majority view be accepted without qualifications. Or suppose a three million dollar sugar mill should be built in Everglades, five or ten miles West of the corporate limits of some one of the cities on the lower east coast, and separated therefrom by vacant lands, and far removed from any city benefits; and the city should promptly secure the passage of an act extending its boundaries by taking in a strip of land so as to run out to and surround the mill, for the sole purpose of subjecting it to city taxes, would even these authorities uphold the validity of such an act? And if not, what then becomes of the unlimited power theory?

These extreme instances show that this generalization cannot be accepted without qualifications. Some of the authorities quoted from themselves exemplify this. Thus, Dillon's Munic. Corp. in Sec. 353, says that the legislative power over the geographical limits of municipalities "is very broad and in fact unlimited," except where the provisions of the charter would contravene constitutional limitations, express or implied." And in Sec. 108, id., it is said: "The supremacy of the legislative authority over municipal corporations is not, however, in all respects unlimited; but the limitations must be sought either in the National or State Constitution; and except as there found, in terms or by fair implication, they do not exist." And at the end of the quotation from Cooley on Taxation it will have been noted that this sentence appears: "But the Legislature has no authority to bring into a municipality territory not contiguous to it and the attempt to do so for

the purpose of increasing the municipal revenues may be treated as void.'' Now, if the ·legislative power over the matter be unlimited, why limit it to ''contiguous'' territory, especially as the Legislature may easily make it technically contiguous by embracing also a strip of the intervening area?

This theory of unlimited power in the passage of statutes establishing or extending municipal boundaries, if correct, would make it an exception to the general rule, and that, too, without giving any sufficient reason for such exception. The general rule is that the Legislature is supreme in the legislative field, which is the most powerful branch of government, *so long as it does not violate any of the provisions of the organic law.* There is to our minds no justifiable exception of any class of legislation from this all-pervasive and fundamental principle. Perhaps the disposition of many able courts to designate the fixing of municipal boundaries as an exception is due to the fact that this undeniably falls within the sphere of legislative power, which power alone can ''draw the boundary line,'' being a power foreign to either the judicial or executive departments, and the further fact that in many cases the establishment of such a line depends so much upon matters, not only of mere fact, but of opinion and judgment, and the courts have ever been loath to substitute their judgments or opinions for those of the Legislature, and never, or rarely, do so, except in those cases where the contrary conclusion is so palpably clear and unmistakable as to absolutely require judicial interposition to maintain the integrity of the fundamental law. As a recent instance, the question was presented to this Court as to whether the construction of certain roads would prove of sufficient benefit to a county as to permit county taxation therefor as a county purpose within the meaning of the Constitution. While holding that ''the Legislature can-

not arbitrarily and without reason defeat the plain intent
and language of the Constitution by authorizing a county
to assess and impose taxes for a purpose that has no legal
and practical relation whatever to any county purpose,'' it
was observed: ''But the legislative determination is en-
titled to great weight, and, in the case of Roads, is, from
the very nature of the subject, difficult to be set aside; for
the question whether a particular road will or will not
prove a substantial benefit to the county is one the determi-
nation of which usually involves matters of opinion and
judgment.'' Jackson Lumber Co. v. Walton County, 116
So. R. 771, 782, 783, 95 Fla. 632. So, also, legislatively
established railroad rates have been set aside by the courts
upon the ground that on the facts shown they would neces-
sarily result in the confiscation of the railroad property.
Instances might be multiplied. The courts have in some
instances gone so far as to annul legislation without citing
any specific violation of the organic law, upon the ground
that it was so arbitrary and unjust in its character as to
constitute *a flagrant abuse* of the legislative power. How-
ever, the writer is of the opinion that an analysis of most
of this latter class of cases will show that what the courts
had in mind was that under the provisions of the Constitu-
tion the objectionable legislation constituted an abuse of
legislative power because it run counter to certain express,
or necessarily implied, provision of the Constitution, or
transcended the power of the Legislature under the Consti-
tution. Because the principle is well settled that the courts
have no right to hold legislation invalid merely because the
courts consider it unwise, impolitic or unjust, or even arbi-
trary and oppressive, so long as it does not contravene the
express or implied provisions of the Constitution. If the
courts assumed the power to veto or revise legislation be-
cause the Legislature had abused the power committed to

its hands by passing merely unwise and unfair laws, but not unconstitutional laws, it would indeed constitute a usurpation of power on the part of the courts without warrant in the Constitution, and one which the judicial branch has ever been careful to avoid.

It thus appears to us that the contention that the power of the Legislature in this particular respect is unlimited and beyond judicial review, unless there is some specific provision of the constitution expressly regulating or restraining the action of the Legislature in the exercise of the particular power, is unsound. Regardless of the absence of such a specific provision, while great latitude must be allowed the Legislature in such matters, yet if the boundary extension act constitutes a palpably arbitrary, unnecessary, and flagrant invasion of personal and property rights clearly guaranteed by other provisions of the constitution, such action is as much subject to judicial review as any other class of legislation. It may be true that only the Legislature can "draw the line," but if the line as drawn be unconstitutional, the courts can set it aside, leaving it to the Legislature to draw another and valid line if it so wills. The difficulty of judicial adjudication of such a class of cases, and the many and various factors which enter into the determination of the constitutionality of such legislation—such for instance as the difficulty of judicially reviewing the exercise of the undoubted power of the Legislature in establishing municipal boundaries to accommodate not only the present but reasonably anticipated future needs of a growing municipality—must not deter the courts from enforcing the constitution in those cases, rare though they may be, where it is, clearly and beyond all reasonable doubt, violated and disregarded.

Primacy of position in our State Constitution is accorded to the Declaration of Rights. It comes first, immediately

after the preamble. These Declarations, comprising 24 short but incisive sections, include the following provisions: Section 1. "All men are equal before the law, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety." (Here we have an implied guarantee of the equal protection of the laws, at least as to the class of rights mentioned, similar to that expressly given in the Fourteenth Amendment to the Federal Constitution. See A. C. L. v. City of Lakeland, 115 So. R. 669, text 685). In Section 2 it is said that "government is instituted for the protection, security and benefit of the citizens." Section 4. "All courts in this State shall be open, so that every citizen for any injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice shall be administered without sale, denial or delay." Section 12 provides that "No person—shall be deprived of life, liberty or property without due process of law; nor shall private property be taken without just compensation." And Section 22 guarantees "the right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches." The declarations close with the admonition in Section 24 that, "This enumeration of rights shall not be construed to impair or deny others retained by the people."

It is significant that our Constitution thus commences by specifying those things which the State government must not do, before specifying certain things that it may do. These Declarations of Rights—those omitted as well as those above quoted, have cost much, and breathe the spirit of that sturdy and self-reliant philosophy of individualism which underlies and supports our entire system of government. No race of hot-house plants could ever have pro-

duced and compelled the recognition of such a stalwart set of basic principles, and no such race can preserve them. They say to arbitrary and autocratic power, from whatever official quarter it may advance to invade these vital rights of personal liberty and private property, "Thusfar shalt thou come, but no further." They constitute a limitation upon the powers of each and all the departments of the State Government. Thus no department, not even the legislative, has unlimited power under our system of government. These declarations even limit to some extent, the exercise of the tremendous, but inherent and well established, powers of taxation and eminent domain. Cooley Const. Lim., 8th Ed. 533-602; 1108-1222; 1026-1039; 1062-3. Cooley on Taxation, 4th Ed., Secs. 58, 67, 69, 131, 143, 144, 247-9, 325.

In Calder v. Bull, 3 Dallas, 386, 1 Law Ed., 648, decided in 1798, the Supreme Court of the United States, speaking through Mr. Justice Chase, said: "There are acts which the Federal, or State, Legislature cannot do, without exceeding their authority. There are certain vital principles in our free Republican Governments which will determine and overrule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law; or to take away that security for personal or private property, for the protection whereof the government was established. An act of the Legislature (for I cannot call it a law) contrary to the first great principles of the Social Compact, cannot be considered a rightful exercise of legislative authority."

In Cooley on Const. Lim., p. 264, it is remarked that while legislative discretion cannot be controlled by the courts, yet "Where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful," it may be. And again, on page 1026,

it is said: ''Everything that may be done under the name of taxation is not necessarily a tax; and it may happen that an oppressive burden imposed by the government, when it comes to be carefully scrutinized, will prove, instead of a tax, to be an unlawful confiscation of property, unwarranted by any principle of constitutional government.'' And on p. 1038, in discussing a burden placed by the State on a single district which was in fact a State obligation, it is said: ''The burden must be borne by those upon whom it justly rests, and to recognize in the State a power to compel some single district to assume and discharge a State debt would be to recognize its power to make an obnoxious district or an obnoxious class bear the whole burden of the State Government. An act to that effect would not be taxation, nor would it be the exercise of any legitimate legislative authority. And it may be said of such an act, that, so far as it would operate to make those who would pay the tolls pay more than their proportion of the State obligation, it was in effect taking their property for the private benefit of other citizens of the State, and was obnoxious to all the objections against the appropriation of private property for private purposes which could exist in any other case.'' Then followed a quotation from the Iowa case of Morford v. Unger, which we wil presently discuss. The text then continues:

> When, therefore, the legislature assumes to impose a pecuniary burden upon the citizen in the form of a tax, two questions may always be raised: First, whether the purpose of such burden may properly be considered public on any of the grounds above indicated; and second, if public, then whether the burden is one which should properly be borne by the district upon which it is imposed. If either of these questions is answered

in the negative, the Legislature must be held to have assumed an authority not conferred in the general grant of legislative power, and which is therefore unconstitutional and void. ''The power of taxation,'' says an eminent writer, ''is a great governmental attribute with which the courts have very wisely shown extreme unwillingness to interfere; but if abused, the abuse should share the fate of all other usurpations.''

And on page 1062-3 of the same work the learned author cites with evident approval the holding in Wells v. City of Weston, 22 Mo. 384, denying the power of the Legislature to subject real estate lying outside the limits of a city to taxation for city purposes, and the holdings of the Kentucky and Iowa courts declaring that it is not competent for the Legislature to increase the limits of a city in order to include therein farming lands not required for streets or houses, where the purpose is to increase the city revenues by taxation. (Thus Cooley on Constitutional Limitations appears to limit also the statement first hereinabove quoted from Cooley on Taxation.)

This court in Consolidated Land Co., v. Tyler, 88 Fla., 14, 101 So. R. 280, held that, under an act of the Legislature creating a special tax bridge district, the collection of taxes against the lands of appellants, although included therein, could be enjoined, where it appeared that they were so located that they could not conceivably be in any way benefited by the building of the bridge, and were unjustly and arbitrarily embraced within the district in violation of organic property rights; citing Willis v. Special Road & Bridge District, 73 Fla., 446, 74 So. R. 495; Paul Bros. v. Long Branch, Etc., Dist., 83 Fla., 706, 92 So. R. 687; Myles Salt Co., v. Board of Commissioners, 239 U. S. 478, 36 Sup. Ct. R. 204, 60 Law Ed., 392, and other cases. While there are certain distinctions between taxes levied by a special

district created for the construction of particular local improvement and those levied by a municipality for general municipal governmental purposes and which all persons and property within the city must pay, yet a municipality is itself a local organization, and its taxation, while general within the city is, however, for city, and hence local, purposes. There is therefore no sound reason which would deny the power of the Legislature to unduly extend the boundaries of a special taxing district to cover property which could not conceivably be benefited by the special improvement, and yet admit the power to unduly extend municipal boundaries so as to subject to city taxes for local city purposes property so located as to be entirely beyond the range of city benefits, thus arbitrarily imposing on such separate and possibly remote locality heavy burdens without compensating advantages of any kind, in derogation of the same class of constitutional property rights which are protected from invasion by the legislature in fixing the limits of a special taxing district.

While our Constitution in Section 8 of Art. 8, says that, "The Legislature shall have power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time," our decisions, far from subscribing to the unlimited power theory, have recognized that in the exercise of this power the legislature is not authorized to violate other provisions of the constitution, expressed or implied. MacGuyer v. Tampa, 89 Fla. 138, 103 So. R. 418; Brown v. City of Lakeland, 61 Fla. 508, 54 So. R. 716; City of Jacksonville v. Bowden, 67 Fla. 181, 64 So. R. 769; City of Tampa v. Prince, 63 Fla. 387, 58 So. R. 542; State ex rel v. Johns, 92 Fla. 187, 109 So. R. 228; State v. City of Sarasota, 92 Fla. 563, 109 So. R. 473. In the MacGuyer case, it was held, and correctly so, that un-

der this Section the Legislature can annex territory to an existing municipality without the consent of its inhabitants, unless some other provision of the organic law is violated by the enactment. In the Sarasota case, it was said that this power must be exercised "in harmony with, and not in violation of," the other provisions of this constitution, such as those contained in certain sections of the declaration of rights, but that "great latitude must be accorded to the legislative discretion in the exercise of the practically plenary power expressly granted it by Section 8 of Article 8."

The case of Kelly v. Pittsburgh, *supra,* decided no more than that the annexation and consequent taxation shown in that case did not deprive the party of his property without due process of law, under the 14th amendment to the Federal Constitution. The 5th Amendment, which prohibits the taking of private property for public use without just compensation, was not considered, for that provision in the National Constitution had long been held to be a restriction upon the Federal Government only, and not upon the States. However, as we have seen, we have such a provision in our State Constitution, which does limit the State's legislative power. Some courts and text writers have held that such a provision applies only to the appropriation of private property under the right of eminent domain. Others, including this court, have given it a greater significance and a broader effect. The language of the provision does not limit its operation to any particular mode of taking, and some courts have applied it to the arbitrary appropriation to public use of private property in the form of money by the method and under the guise of taxation where under the facts the taxation, was not legally or constitutionally justifiable. This court has applied this provision to save from threatened confiscation a railroad

company's property because of the reduction of rates by the Commission to such an extent that the railroad could not pay the expenses of operation. See P. & A. R. Co. v. State, 25 Fla. 310, 5 So. R. 833, citing Stone v. Farmers Loan & Trust Co., 116 U. S. 309, 29 Law Ed. 636. It would seem that such unconstitutional provisions should be given a liberal construction to the end that the principle announced should be preserved and applied to conditions as they arise, in accordance with the essential meaning and intent of the language used, fairly and reasonably interpreted. Judge Cooley has said: "Taxation and eminent domain, indeed, rest substantially on the same foundation, as each implies the taking of private property for public use on compensation made; but the compensation is different in the two cases. When taxation takes money for the public use, the taxpayer receives, or is supposed to receive, his just compensation in the protection which government affords to his life, liberty and property, and in the increase in the value of his possessions by the use to which the government applies the money raised by the tax, and either of these benefits will support the burden."

This principle as to presumptive benefits of a general nature not only applies to general taxation by the State, but also to the general taxes imposed by a municipality for general city purposes on all property within its boundaries, where such boundaries are lawfully and constitutionally established. It must be admitted also that in such situation there can be no precise adjustment of the tax on each individual taxpayer in exact proportion to the benefits received. In such cases, inequality of tax burdens are to some considerable extent unavoidable and inevitable, and as a rule afford no ground for judicial relief.

As is said by Cooley, in one of the sections quoted: "Practical equality is constitutional equality. Perfect

equality in taxation has been said time and time again to be impossible and unattainable." And again (Sec. 259, Cooley's Tax.) he says: "Yet there are cases where there is such glaring inequality intentional or otherwise, as to clearly violate the equality and uniformity rule." And in Section 260, it is said: "The requirement of equality and uniformity of taxation relates to the rate of taxation, the valuation for taxation, territorial equality, and according to one view, the inclusion of all property as the subject of taxation." · And he adds, in Section 261, that "it is not necessary that the benefits arising therefrom should be enjoyed by all people in like degree, nor that each one of the people should participate in each particular benefit."

All this is admitted. But much that is said on this subject by the advocates of unlimited legislative power, is beside the mark, and confuses individual inequality with territorial inequality. The mere fact that it is not practically possible to avoid some inequalities in burdens and benefits as between the taxpayers within the legitimate bounds of a city, where all receive at least some benefit, is no reason for upholding the Legislature in arbitrarily extending the city limits so as to take in a large district of territory which will not be benefited at all, at least not in any substantial way. Purely speculative and shadowy benefits which amount to no more than a mere pretext for arbitrary action, are not to be considered.

It is admitted that within the boundaries of a municipality, no matter how fairly drawn, it is practically impossible to avoid some inequality of burdens, but in such cases all the inhabitants and their property are at least within the range of, and receive, municipal benefits of some sort, and such is the very sensible and practical presumption upon which the courts refuse to interfere And it must be admitted also, that there may exist in such cases some un-

avoidable degree of territorial inequality—some indentations of agricultural or rural lands here and there across and inside the municipal boundary lines, which lines of necessity must be drawn so as to provide some degree of symmetry and regularity in the shape and contour of the city and allow some latitude for its reasonably anticipated growth. Common sense must be used in such matters. It is not every case, even of territorial inequality, or even the absence of actual present territorial benefits, which would authorize the interposition of the courts. But where, as in the case made by the information filed herein, there appears a gross and glaring territorial inequality—a sudden, unreasonable and wholesale extension of municipal boundaries so as to take in a large area many times the size of the original, and real, city—without any municipal benefit thereto, actual or contemplated, and yet subjecting this territory to taxation for past as well as present and future city indebtedness and other city purposes, a different situation is squarely presented. ''Such an act,'' says Thomas A. Marshall, C. J., in the Kentucky case of Cheaney v. Hoosier, 9 B. Monroe, 330, 347, ''though on its face simply extending the limits of a town, and presumptively a legitimate exercise of power for that purpose, would in reality when applied to the facts, be nothing more or less than an authority to the town to tax the land to a certain distance outside of its limits, and in effect take the money of the proprietor for its own use without compensation to him.'' Elsewhere in this very able opinion, with reference to the legislative powers as to taxation and the territory where it shall operate, it is said:

It would, therefore, be a task of extreme delicacy, for the judiciary to decide upon its own mere judgment, with respect to any of the particulars referred to,

that the Legislature has exceeded the limits of the discretionary power with which it is invested. And we should doubt greatly our right to make such a decision in any case in which the legislative power attaches to any extent, if there be not in the constitution itself, and in the clause now under consideration, some limit to the legislative discretion. That limit can only consist in the discrimination to be made between what may with reasonable plausibility be called a tax, and for which it may be assumed that the objects of the taxation are regarded by the Legislature as forming a just compensation, and that which is palpably not a tax, but is under the form of a tax, or in some other form, the taking of private property for the use of others or of the public, without compensation. Exact equality in the distribution of public burthens and especially of such as are local, is perhaps unattainable and cannot form the test of the distinction referred to. There must be a palpable and flagrant departure from equality in the burthen as imposed upon the persons or property bound to contribute, or it must be palpable that persons or their property are subjected to a local burthen for the benefit of others, or for purposes in which they have no interest, and to which they are, therefore, not justly bound to contribute. The case must be one in which the operation of the power will be at first blush, pronounced to be the taking of private property without compensation, and in which it is apparent that the burthen is imposed without any view to the interest of the individual in the objects to be accomplished by it. If it be so, no matter under what form the power is professedly exercised, whether it be in the form of laying or authorizing a tax or in the regulation of local divisions or boundaries, which result in a subjection to

local taxes, and whether the operation be to appropriate the property of one or more individuals, without their consent, to the use of the general or local public, or to the use of other private individuals or of a single individual, the case must be regarded as one coming within the prohibition contained in this clause, or the constitution is impotent for the protection of indivdual rights of property from any aggression, however, flagrant, which may be made upon them, provided it be done under color of some recognized power. We are not prepared to concede that it is thus important. But while we are disposed to consider this clause of the constitution as being sufficiently comprehensive to form a barrier against flagrant outrage of palpable wrong in taking property under any power possessed by the Legislature, it is too indefinite in its character to afford protection to every case of seeming hardship or injustice, or to authorize a judicial tribunal to inquire into the minute operation of laws imposing or authorizing taxes, or regulating the boundaries of local jurisdictions, and to arrest their operation in every case in which the Court may find some inequality and consequent oppression. The case must be palpable and the injury flagrant, to authorize the Court, on the ground of this clause, to interfere with the exercise of a power so important and so indefinite as that of taxation by the legislative department.''

The case just quoted from, and the case of Morford v. Unger, 8 Iowa, 82, are probably the leading cases on this subject. The last cited case involved the constitutionality of an act extending the limits of the City of Muscatine one mile to the east and two miles to the north and west, so as to include land used exclusively for farming purposes. The act was held void because in conflict with the provision pro-

hibiting the taking of private property without compensation. In the course of a well considered opinion by Stockton, J., it was said:

If there be such a flagrant and palpable departure from equity, in the burden imposed; if it be imposed for the benefit of others, or for purposes in which those objecting have no interest, and are, therefore, not bound to contribute, it is no matter in what form the power is exercised—whether in the unequal levy of the tax, or in the regulation of the boundaries of the local government, which results in subjecting the party unjustly to local taxes it must be regarded as coming within the prohibition of the Constitution designed to protect private rights against aggression, however made, and whether under the color of recognized power or not. It is urged by the plaintiff, that his farm, which is sought to be brought within the jurisdiction of the city, is agricultural land; that it is one mile from the old boundary of the city, and the same distance from any lands laid out into city lots, or used or needed for city purposes; that he can derive no benefit from the extension of the municipal government over him and his property; and that the act subjecting him to taxation at the will of the city council, and for its benefit, is an appropriation of his private property for the use of the city, without any compensation or benefit accruing to him in return.

In the framework and operation of our government, says Mr. Sedgwick, the protection of vested rights is the great practical object sought to be obtained. The legislative power being the most formidable, our system chiefly aims to guard the citizen against the legislative—to protect him against the power of a majority, taking the shape of an unjust law. The unjust action

of government with us, is most likely to take the shape of attacks upon rights of property. All government, indeed, resolves itself into the protection of life, liberty and property. Life and liberty, in our fortunate condition, are, however, little likely to be injuriously affected by the action of the body politic. Property is very differently situated. * * * The question connected with taxation are every day becoming of more and more pressing importance. The taxing authority is, after all, but one arm of that tremendous power of *eminent domain,* at the foot of which, so far as uncontrolled, every citizen lies prostrate; and the consequence of the earlier decision, leaving this engine in the hands of unrestrained legislative authority, seems to have awakened that conservative jealousy of power, which never lies long dormant in the breast of our people. Certain it is, that the more recent Constitutions, and the more recent judicial decisions, show a disposition not to abandon the taxing power to the often ill-regulated and despotic will of our fluctuating and hasty legislation.'' Sedgwick on State and Constitutional Law, 673.

The extension of the limits of a city or town, so as to include its actual enlargement, as manifested by houses and population, is to be deemed a legitimate exercise of legislative power. An indefinite or unreasonable extension, so as to embrace lands and farms at a distance from the local government, does not rest upon the same authority. And although it may be a delicate, as well as a difficult, duty for the judiciary to interpose, we have no doubt but strictly there are limits beyond which the legislative discretion cannot go. It is not every case of injustice which may be reached; and it is not every case which will authorize a judicial

tribunal to inquire into the minute operation of laws imposing taxes, or defining the boundaries of local jurisdictions. The extension of the limits of the local authority, may in some cases be greater than is necessary to include the adjacent population, or territory laid out into city lots, without a case being presented, in which the courts would be called upon to apply a nice or exact scrutiny as to its practical operation. It must be a case of flagrant injustice and palpable wrong, amounting to the taking of private property, without such compensation in return as the taxpayer is at liberty to consider a fair equivalent for the tax.''

In Utah v. Daniels, 6 Utah 288, 5 L. R. A. 444, an act of the territorial legislature extending corporate limits was held to have violated the 5th Amendment to the Federal Constitution. In a very lucid treatment of this subject, the conclusion is reached that: ''A law authorizing the asessment of taxes for municipal purposes upon lands or their occupants located beyond the range of municipal benefits is not a rightful subject of legislation; that taxation for city purposes should be within the bounds indicated by its buildings, or its streets and alleys, or other public improvements and contiguous or adjacent districts so situated as to authorize a reasonable expectation that they will be benefited by the improvements of the city or protected by its police; that no outside district should be included when it is apparent and palpable that the benefits of the city to it will only be such as will be received by other districts not included, such as will be common to all neighboring communities.''

In the able dissenting opinion of Chief Justice Agnew, in Kelly v. Pittsburgh, *supra,* it was said:

If the Legislature can, by a mere extension of boundary, authorize the city to tax farm lands for purely city purposes, it might, without extension, direct all farms, within given lines, outside of the city, to pay these city taxes. Thus, when we get rid of that confusion of thought which confounds extension of boundary and power of taxation, we perceive that taxes laid on mere farm lands to pay city levies applicable only to the built-up or true city, is nothing more than an order to farmers for the benefit of the city residents; it is taking the money of A to pay for improvements made for the use of B. This is palpably and flagrantly unjust, and therefore against common right. If the Legislature itself cannot compel farmers to pay city taxes for purely local purposes in which they have no share, it is clear it cannot authorize the city to do indirectly what it cannot do directly. An order, with or without the extension of boundary, upon a certain class to pay taxes for local benefits conferred on others, is wholly different from a power to pay a general tax for the support of government. The latter is a power to which every citizen of a State submits himself in consideration of the general benefits derived from government. But as to the former, it is well said, in Bradshaw v. The City of Omaha, 1 Nebraska 16, that the object is to make the owners of farms divide the expense of supporting the municipal government with those who need it; that the true city is the built-up part; while the levy of taxes on farms is to confiscate property outside for the benefit of those within the true city. See, also, Taylor v. Porter, 4 Hill 140; Holden v. James, 11 Mass. 396.

The power of the Legislature is clear to divide the State, for convenient local government, into counties,

townships, cities, boroughs, etc., conferring on each appropriate autonomy. But in doing this the powers conferred must be adapted to the ends to be accomplished by each. A sound and large discretion is necessarily exercised in this adaption of powers. But it is equally clear that the powers conferred must have a reasonable appropriateness to the end proposed.

The inviolability of the right of private property and the natural boundary of the legislative power has been enforced already in this State in the case of Washington Avenue, 19 P. F. Smith, 363, in these words: "When, therefore, the Constitution declares in the ninth article that among the *inherent* and indefeasible rights of men is that of acquiring, possessing and protecting property, that the people shall be secure in their *possessions* from unreasonable searches and *seizures;* that no one can be *deprived* of *property* unless by the judgment of his peers or the law of the land; that no man's *property* shall be taken or *applied* to public use without *just compensation* being made; that every man for an injury to his *lands* or *goods* shall have remedy by due course of law, and right and justice administered without sale, *denial* or delay, and that no law *impairing* contracts shall be made, and when the people to guard against *transgressions* of the high powers delegated by them have declared that all these rights are excepted out of general powers of government, and shall forever remain inviolate, they for their own safety *stamped upon the right of private property an inviolability which cannot be frittered away by verbal criticism on each separate clause, nor the united fagot broken stick by stick, until all its strength is gone. There is a clear indefeasible right of property, followed by the clauses guarding it against*

*specific transgressions, that covers it with an aegis of protection against all unjust, unreasonable and palpably unequal exactions, under any name or pretext;* nor is this sanctity incompatible with the taxing power, or that of eminent domain, where for the good of the whole people burdens may be imposed or property taken. I admit that the power to tax is unbounded by any express limit in the Constitution; that it may be exercised to the full extent of the public exigency. I concede that it differs from the power of eminent domain, and has no thought of compensation by way of return for that which it takes and applies to the public good, further than all derive benefit from the purpose to which it is applied. But nevertheless, taxation *is* bounded in its exercise by its own nature, essential characteristics and purpose. It must, therefore, visit all alike in a reason practicable way, of which the legislature may judge, but within which the just limits of what is taxation. * * * Therefore, while we concede the wide range to be given to legislative discretion in adapting the means to the end, that is, to the purposes of *local* government, there is a limit beyond which the legislative power cannot sacrifice the sacred right of private property. This limit is reached when it palpably and plainly sacrifices this right, which the people themselves have jealously guarded against transgressions in their fundamental law. There must be, therefore, a reasonable appropriateness in the means employed to execute the legislative purpose.

There is in this case no question of estoppel by acquiescence for any considerable period. See McQuillin, Sec. 306. We conclude, therefore, that the information makes out a *prima facie* case for the relief sought, and that on the facts therein stated, the Act (Chap. 11750 of Laws of 1925)

extending the boundaries of the City of Stuart, so as to include the considerable body of rural lands owned by the co-relators some distance to the northeast of the actual city and beyond the range of municipal benefits, would appear to contravene those provisions of our Declaration of Rights, protecting the rights of private property such as those which prohibit the taking of private property without just compensation, and guarantee the equal protection of the laws and the right to acquire, possess and protect private property.

In addition to the three cases above quoted from, some of the well considered cases supporting the views above expressed are: Bradshaw v. Omaha, 1 Neb. 16; Courtney v. Louisville (Ky.), 12 Bush. 419; Covington v. Southgate (Ky.), 15 B. Mon. 491; Parkland v. Gaines, 88 Ky. 562; Louisville Bridge Co. v. Louisville, 81 Ky., 189; Kaysville v. Ellison, 18 Utah, 163, 43 L. R. A. 81; Vestal v. Little Rock, 54 Ark. 321, 11 L. R. A. 778; Waldrop v. Kansas City, 131 Ark., 453, 199 S. W. 369; Wells v. Weston, 22 Mo. 384; Fulton v. Davenport, 17 Iowa 404; Durant v. Kauffman, 34 Iowa, 194; Langworthy v. Dubuque, 13 Ia. 86; Smith v. Sherry, 50 Wis. 210; 6 N. W. 561. See also McQuillin Municipal Corp., 2nd Ed., Secs. 291-295 of 2nd Ed. being Secs. 272-8 of the first edition, and cases cited, as to exercise of power of extension of municipal boundaries by local action under general statutes; generally held subject to judicial review.

The demurrer to the information will be overruled and the motion to quash denied.

We will now turn to the answer of the respondent city.

The answer alleges that respondent is exercising municipal powers over the territory described in the information by virtue of the two legislative acts referred to therein, and makes a general denial of any unconstitutionality of either

of said acts. That chapter 11214, abolishing the former Town of Stuart and creating the City of Stuart, approved May 21, 1925, provided that it should become effective if and when ratified by a majority of the qualified freeholder voters residing within the territory affected by the act, at an election to be called within twenty days after the approval of the act; that the "Mayor and Clerk" of the town of Stuart published a call for said election once a week for four consecutive weeks, commencing June 4th, 1925, and that at the election held June 30, 1925, "the act was ratified by a majority of the qualified voters." That thereafter the Legislature passed the act (Chapter 11750) extending the boundaries of the City of Stuart which has thus been previously incorporated under Chapter 11214; that both said acts were constitutional and valid.

It is contended by realtors that this part of the answer is insufficient, because the first act required the "Mayor and Council" of the Town of Stuart to publish the call for the election, whereas the answer says it was done by the "Mayor and Clerk." If the publication of the call for the election was made by the Mayor and Clerk under the direction and with the authority of the Mayor and Council, we think that would have been sufficient. But the answer does not so allege. It is also contended that the answer fails to show ratification by a majority of the qualified freeholder voters, as required by the act, merely alleging ratification by a majority of the "qualified voters." Perhaps the meaning intended was, voters qualified to vote under the act. While the allegations of the answer in both these particulars is technically defective, the information did not attack the validity of the act on those grounds. In fact, the information in this case does not allege any facts whatever attacking the validity of Chapter 11214, or the election held thereunder. It attacks the later act extending the

boundaries of the city incorporated by the first act. Of course, if the first act was void, the second would fall with it. If, however, the above objections were the only ones made to the answer, we would be disposed to allow if desired an amendment by respondent to them, which in all probability could be done.

The serious question pertains to the sufficiency of the answer in that portion of it which is supposed to meet the charge of unconstitutionality, as made in the information, against Chapter 11750, in extending the city boundaries North of the River so as to take in the lands of co-relators. Aside from the general denial of unconstitutionality and the general allegation that said lands have been benefited by such inclusion, which are mere conclusions of the pleader, the answer utterly fails to meet the allegations of facts in the information showing remoteness of location and entire absence of municipal benefits. As this was the gist of the case, the respondent's failure to justify by alleging facts to meet such charge, or to specifically deny the facts alleged, can hardly be attributed to mere oversight, and in effect, amount to an admission of the material facts charged. The answer merely alleges ''that within the territory described in the information in which the lands sought to be excluded are situated,'' certain benefits have been or are intended to be conferred, but it does not allege that these benefits reach the lands of the co-relators, which are shown by the information to be located in the eastern half of the annexed territory North of the River. These alleged benefits, so far as the answer shows, may all have been furnished to the western or some other portion of the added territory and hence remote from and of no benefit to co-relators' lands. The benefits referred to in the answer and therein very briefly alleged, are: (1) fire protection, ''from the maintenance by the city of an efficient and well equipped fire

company'', (2) police protection, ''by the regular patrolling of the police,'' (3) that ''the city has built and paced a number of roads and streets and maintained them,'' (4) ''that the health and safety of the inhabitants are served by the City's Health Department by means of regular inspections and the eradication of mosquitoes and that a municipal hospital is now being supported by the city for the benefit of the citizens,'' (5) ''that the city has voted improvement bonds in the sum of $210,000.00 for the purpose of paving roads and streets within this territory.'' None of these benefits are alleged to reach or affect the property of the co-realtors. The only benefit which is alleged to be available to all the territory sought to be annexed is, in the language of the answer, ''that all of said territory is accessible to electric light and telephone service under the City's franchises and that such service would not be available unless the territory was within the municipal limits.'' This language implies that such service was available, not from the city directly, but from the utility corporations operating under city franchises. The information alleged that co-relators had telephone connections through the nearby town of Jensen, and that no poles for electric lights had been placed for service to their section. It will also be recalled that the information expressly denied that the property of co-relators had been furnished by the City with any roads or streets, or police or fire protection, or city benefits of any kind, and that none were contemplated. These allegations are not met by the averments of the answer, which are referrable to other portions of the extensive territory covered by the act. The answer closes with a general denial that the property of co-relators had been over assessed and no improvements had been made by the city upon the same and that none were in contemplation by the city, but alleges that the property is assessed at a rea-

sonable and fair valuation and that "improvements have been made and further improvements contemplated, as is set up herein." This last clause qualifies the preceding allegations by relating back to the equivocal averments already discussed.

Though co-relators are joined, the information in this case was filed in the name of the State on the relation of the Attorney General. It was, therefore emphatically the duty of the respondent to answer the allegations of the information fully and specifically, showing just exactly what the city had done or failed to do or planned to do with respect to furnishing municipal benefits to the described territory owned by the relators. It was held in State v. Gleason, 12 Fla. 190, that the respondent "much justify or disclaim, and not guilty or *non usurpavit* are not good pleas. All the facts necessary to constitute a good title must be set up. In default of such a plea, judgment by default goes for the State."

Instead of demurring to, or moving to strike, the answer, relators filed a motion for judgment of ouster, evidently upon the theory that the answer failed entirely to justify the usurpation charged. This course was followed in the Gleason case, but, though the plea or answer was held insufficient, the court gave the respondent the privilege of filing an amended answer, the effect being the same as if a demurrer had been filed instead of motion for judgment of ouster. The motion was in effect treated as a demurrer. However, the court had the power, if it saw fit, to grant the motion and render the judgment moved for. See Crandall's Common Law Prac., 674, 675, also State ex rel Law v. Saxon, 25 Fla. 342, 5 So. R. 801.

This Court might well be justified in now granting the motion for judgment, but as this proceeding involves the validity of an act of the Legislature as applied to the facts,

the Court desires to give the respondent full opportunity to justify, if it can, the usurpation charged.

Therefore, the demurrer to the information and the motion to quash same are overruled and denied, and the answer of the respondent is held insufficient, with leave to respondent to file, if desired, an amended answer within fifteen days, and upon respondent's failure so to do, the motion for judgment of ouster will be granted.

PER CURIAM.—Since the above was written and the action therein indicated taken by this Court, the respondent has signified to the Court that it has no desire to file an amended answer.

It is therefor ordered that the judgment of ouster be entered as prayed.

TERRELL, C. J. AND WHITFIELD, ELLIS, STRUM AND BUFORD, J. J., concur.